**Nat HOLT and Blanche Holt, Husband and Wife, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 17515 and 17516.**

United States Court of Appeals
Ninth Circuit.

May 4, 1962.

688

Thomas E. O'Sullivan, Gerard C. Tracy, Beverly Hills, Cal., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, William A. Friedlander, Attorneys, Dept. of Justice, Washington, D. C., for respondent.

Before HAMLIN and MERRILL, Circuit Judges, and WALSH, District Judge.

HAMLIN, Circuit Judge.

Petitioners, Nat Holt and Blanche Holt, husband and wife, reported certain income for the years 1953, 1954 and 1955 which they treated as capital gain. The Commissioner of Internal Revenue treating the income as ordinary income assessed deficiencies for taxes due in those years. A petition for redetermination of deficiencies was filed with the Tax Court and the Tax Court upheld the contentions of the Commissioner that the income was to be taxed as ordinary income rather than as capital gain. We have jurisdiction of the petition to review the decision of the Tax Court under the provisions of Section 7482 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7482.

The petitioner, Nat Holt, is a producer of motion pictures. On February 6, 1950, petitioner executed an agreement with Paramount Picture Corporation, hereinafter referred to as Paramount, whereby petitioner was to produce two motion pictures for Paramount in return for a production fee of $15,000 per picture plus a sum equal to 25% of the excess gross receipts from the pictures. "Excess

gross receipts" were defined in the contract.[1] Paramount was to provide the funds necessary for production and it was to approve certain aspects of production. The agreement was not to constitute a partnership between Holt and Paramount, and Holt owned no part of the pictures. The rendition of supervision and services by Holt personally was agreed to be of the essence of the agreement. On October 23, 1950, the agreement was amended to provide for the production of a third moving picture.

On February 1, 1950, just prior to the consummation of the two-picture agreement between Holt and Paramount, Holt sent a letter to a New York attorney, William B. Jaffe, which set forth the terms of a partnership agreement between Holt and Jaffe. The partnership, called Nat Holt Pictures, was to own Holt's right to receive 25% of the excess gross receipts from the pictures. Holt's share of the partnership was 66⅔% and Jaffe's share was 33⅓%. The partnership was not to have any interest in Holt's $15,000 production fee for each picture. Jaffe was to receive the first $1,500 of the money payable to the partnership; thereafter, the ⅔-⅓ arrangement would be in force.

In August, 1950, Jaffe informed Holt that he was giving his law partner, Harold H. Stern, a portion of his (Jaffe's) one-third interest. Holt agreed to this and thereafter Holt was to get 66⅔%, Jaffe 20% and Stern 13⅓%.

On February 6, 1951, Holt, Jaffe and Stern entered into another partnership agreement on the same terms for the purpose of producing more pictures for Paramount. This second partnership was named "Nat Holt and Company." On February 12, 1951, the Nat Holt and Company partnership entered into an agreement with Paramount for the production of six more pictures. Holt was to devote his full time and services to the production of these films and he was to receive $20,000 per film. The partner-

---

1. "Excess gross receipts" were defined as those sums over and above 1.9 times the cost of production of black and white pictures and 2.0 times the cost of colored films.

ship was to receive 25% of the excess gross receipts, just as in the first agreement, but the partnership was not to receive any portion of Holt's $20,000 production fee per picture.

In 1952, Paramount made advances to petitioner against the 25% excess gross receipts of the first three pictures produced. This money was reported as ordinary income, the only income, of the Nat Holt Pictures partnership for 1952, and the partners were taxed on their proportionate shares accordingly.

In May, 1953, the six picture agreement was amended to provide for the production of two additional pictures under the same terms.

Toward the completion of the second group of pictures—under the original six picture agreement—it became apparent to Paramount that the market for the type of picture being produced by Holt was diminishing. As a result, it was decided that an arrangement should be worked out whereby the production of any further pictures by Holt (i. e., the two additional pictures agreed to be produced by the amendment to the six picture agreement) would be terminated. Accordingly, Jaffe negotiated an agreement with Paramount which recited, *inter alia*, that Holt and the partnerships had produced nine pictures for Paramount and that Paramount was the sole owner of such pictures. Under the agreement the partnerships and Holt were to be relieved from any obligation to produce any further pictures and Paramount was relieved of any obligation to finance said pictures and so forth. In consideration of the release of all claims against Paramount for any rights to any portion of the excess gross receipts which were due or to become due to Holt and the partnerships under either of their agreements and in further consideration of the extinguishment of any obligations under the agreements, Paramount was to pay the partnerships a total sum of $153,000. In arriving at the $153,000 figure Paramount prepared schedules of projected earnings of the pictures and attempted to approximate what the producer's share of the excess gross receipts would be.

The petitioner reported his 66⅔% share of the $153,000 payment made pursuant to the 1953 termination agreement with Paramount as capital gain income. The Commissioner determined that the income was ordinary income and assessed deficiencies accordingly. The petitioner filed a petition with the Tax Court for redetermination of deficiency and contended that the income from the $153,000 termination payment was properly treated as capital gain. The Tax Court found, *inter alia*, upon substantial evidence, that petitioner's right to participate in the excess gross receipts of the pictures produced by the petitioner under the two production agreements was compensation for services rendered or to be rendered under the two agreements. Accordingly, the Commissioner's determination that the income was ordinary income and not capital gain was upheld.

On brief in his "Statement of Points to be Urged" the petitioner claims that the Tax Court erred in failing to make findings concerning many facts incidental to the above outlined transactions that were requested by petitioner and allegedly required by the evidence. On the whole these alleged errors in the findings concern facts which have no special relevance or pertinency to the only issue in this case: whether the $153,000 lump sum payment made by Paramount to the partnership in extinguishment of the partnership's right to receive 25% of the excess gross receipts was ordinary income or capital gain. Under any statement or characterization of the evidence in this case the $153,000 would be ordinary income, and we are in full agreement with the opinion of the Tax Court, 35 T.C. 588, to that effect.

There is no dispute in this case that the $153,000 was taxable income. The only dispute is whether the sum should be taxed as ordinary income or as capital gain. The petitioner concedes that payments of the 25% of the excess gross receipts if received each year would be ordinary income. But petitioner con-

tends that when a lump sum was received in return for all rights to receive these payments in the future the lump sum became capital gain. The petitioner contends that the right to receive the payments of 25% of the excess gross receipts was a property right which constituted the sole assets of the partnerships and that when the partnerships sold their respective assets to Paramount for a lump sum a capital gain was realized.

■ Section 117 of the Internal Revenue Code of 1939 defines a "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)".[2] A "long term capital gain" is defined as a "gain from the sale or exchange of a capital asset".[3] Although it is possible to characterize a right to receive 25% of the excess gross receipts of a number of moving pictures as a property right in the broad sense of that term, the Tax Court correctly pointed out that not all property rights are capital assets within the meaning of the tax statutes. E. g., Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960). In the Gillette Motor Transport, Inc. case the taxpayer had received compensation from the Government in return for the temporary taking of its business during World War II. The question was whether the payment which was made pursuant to the "just compensation" clause of the Fifth Amendment constituted ordinary income or capital gain. In holding that the payment was ordinary income the Court stated:

"[T]he fact that something taken by the Government is property compensable under the Fifth Amendment does not answer the entirely different question whether that thing comes within the capital-gains provisions of the Internal Revenue Code. Rather, it is necessary to determine the precise nature of the property taken. * * *

* * * * * *

"While a capital asset is defined in § 117(a) (1) as 'property held by the taxpayer,' it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." [4]

Petitioner's right to receive 25% of excess gross receipts was not a capital asset at any time.[5]

■ The Tax Court properly characterized the $153,000 transaction in this case as a lump sum payment in consideration for the right to receive income in the future. It is well settled that a

---

2. 26 U.S.C. § 117(a) (1) (1952 ed.).

3. 26 U.S.C. § 117(a) (4) (1952 ed.).

4. 364 U.S. at 133–134, 80 S.Ct. at 1500.

5. It is interesting to note that it is quite possible that petitioner's right to receive 25% of excess gross receipts would come within an express exception to the definition of what is a capital asset within the Internal Revenue Code of 1939. Section 117 of the 1939 Code, after defining a "capital asset" as property held by the taxpayer, provides that *the term does not include* "a copyright; a literary, musical, or artistic composition; or similar property; held by a taxpayer, whose per-

sonal efforts created such property." 26 U.S.C. § 117(a) (1) (C) (1952 ed.). While petitioner's interest in 25% of excess gross receipts of the pictures he produced was not a copy right it might well come within the meaning of *an artistic composition or similar property*. And there can be no question that petitioner's personal efforts helped create the "artistic composition" or "similar property" in which he had an interest. Under this view the petitioner's property, not being a capital asset, could only result in the production of ordinary income. We find it unnecessary, however, to make any decision on this point in this case.

right to receive future income which is commuted into a lump sum payment results in ordinary income just as the income if actually received in the future in several payments would be ordinary income. The nature of the right to receive future income as ordinary income does not change into capital gain by the mere receipt of a lump sum in lieu of such future payments. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941); Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940).

In Hort v. Commissioner, supra, the taxpayer owned property which was leased to a bank for $25,000 per year. Several years before the expiration of the lease the bank determined that it was no longer profitable to maintain a branch on the premises leased to it by the taxpayer. A contract was entered into between the taxpayer-lessor and the bank-lessee whereby the lessor would receive a $140,000 lump sum payment in return for cancellation of the lease. The taxpayer claimed a capital loss for the difference between the total of the unpaid lease payments and the $140,000 received. He contended that the transaction was capital because it involved the sale of a right. It was contended that since the payment received was less than the right to receive the individual lease payments in the future the difference was a capital loss. The Supreme Court assumed that the right to receive lease payments was "property" whatever that term signifies in the abstract, but held that the transaction resulted in ordinary income. The $140,000 represented that present discounted value of the right to receive future rental payments and thus was ordinary income.

The rule and reasoning of Hort are clearly applicable to this case. In the instant case the $153,000 was no more than the commutation of the right to receive future income in the form of payments representing 25% of the excess gross receipts realized from the pictures which the petitioner produced. The future payments were additional compensation for petitioner's services as a producer.

The essence of a capital transaction within the tax statutes and decided cases is that the sale or exchange of an asset results in a return of a capital investment coupled with realized gain or loss (as the case might be) which accrues to the investment over a certain period of time. The petitioner invested nothing for the return of 25% of the excess gross receipts of the film except his services as a producer. There was no return of a capital outlay in this case. Payments for services constitute ordinary income, and a right to receive income in the future does not become a capital asset merely because it is owned by a partnership. There is no difference in the nature of the right to receive future payments when they are owned by an individual and when owned by a partnership. If the payments to the one would be income the same payments to the other would also be income. If future payments when commuted into a lump sum are income to the individual the same payments to a partnership commuted into a lump sum payment would likewise be income.

Without having to decide the question and without going into detail, we note in passing that there was not a "sale or exchange" of a capital asset in this case within the meaning of the tax statutes. In general it can be stated that the mutual relinquishment of rights and obligations under a contract or contracts is not a "sale or exchange" as contemplated by the revenue code. Hort v. Commissioner, supra; Leh v. Commissioner, 260 F.2d 489 (9th Cir., 1958).

In light of the record in this case and the applicable authority no useful purpose would be served by prolonging this opinion beyond its present length. There is only one issue: whether the $153,000 lump sum payment was ordinary income or capital gain. We believe that the Tax Court properly re-

solved that issue. No other resolution would be possible under the evidence. For the reasons stated in the opinion of the Tax Court, 35 T.C. 588, and those appearing in the foregoing opinion of this court, the judgment is affirmed.