**UNITED STATES of America, Appellant,**

v.

**Charles G. EIDSON, Jr., et al., Appellees.**

**No. 19414.**

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1962.

Ernest Morgan, U. S. Atty., San Antonio, Tex., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Michael I. Smith, Attys., Dept. of Justice, Washington, D. C., for appellant.

J. Rodney Lee, Waco, Tex., Naman, Howell, Smith & Chase, Waco, Tex., for appellees.

Before TUTTLE, Chief Judge, HUTCHESON, Circuit Judge, and CONNALLY, District Judge.

TUTTLE, Chief Judge.

This appeal by the United States from a judgment entered by the District Court without a jury presents the question whether amounts received by the taxpayers in consideration for the assignment by them of their rights under a management contract which they had with an insurance company are taxable as ordinary income or as capital gains. The appellees contend, and the District Court found, that the assignment by the taxpayers in return for a payment by the assignee of $170,000 constituted a sale or exchange of a capital asset.

The essential facts are not in dispute. American Bankers Life Insurance Company was organized in 1895 under the laws of the state of Texas, and has operated as a statewide mutual assessment life, health and accident insurance company. In the operation of such insurance companies it is advantageous to obtain qualified executives by giving them long term management contracts. This was accomplished in this case by the taxpayers here and certain associates who participated with them in all the transactions hereafter related obtaining proxies from a sufficient number of the policyholders of this mutual company so that by voting the proxies they could elect the board of directors consisting of themselves and authorize the execution of a management contract with themselves. No one contends that any question of conflict of interest or anything of the kind in any way vitiates the management contract. This contract gave to Charles G. Eidson and Charles G. Eidson, Jr., Jack L. Eidson, Margaret E. Metz, and J. D. Metz, broad powers as general agents and managers of the life insurance business of American Bankers. In its terms it states that American Bankers "employed" the individuals to do the following things:

"1. The FIRST PARTY grants to the SECOND PARTY the sole and exclusive General-Agency-Managerial-Service Contract which carries with it the exclusive right to solicit new business and to employ agents for that purpose, subject to the laws of Texas, the regulations of the Insurance Department of Texas, and as may be set forth from time to time by the Directors of the Company. The PARTIES of the SECOND PART shall have the responsibility of the management of the business of the FIRST PARTY as contemplated by the corporate Charter and By-Laws of the Company,— and they shall devote their best efforts to the direction of the affairs and business of the Company."

The contract was for a period of ten years and was subject to renewal by the boards of directors. It was also, by its terms, assignable by the individuals upon approval of the majority of the board of directors of the company.

Compensation to the managers was determined in the following manner: The Texas state law required that the premiums received from policyholders be placed in two funds—the general fund and the mortuary fund. The general fund was composed of the entire amount of the premiums received during the first year from all policyholders, and 40% of all premiums subsequently received, the remaining 60% of the premiums received in years subsequent to the first policy year going into the mortuary fund. Use of the sums in the mortuary fund was restricted to the payment of justified claims on policies that had been in existence for more than one year, and, to a limited extent, to pay the cost of defending unjustified claims on such policies. The general fund, on the other hand, was required to be used to pay all other expenses of operating American Bankers, the managers being entitled to the balance of the fund, if any, after the payment of all expenses of operation as their profit under the management contract. This contract was made effective January 1, 1952, and continued until July 27, 1955. The managers had continued in management of the affairs of the insurance company as a partnership known as "Charles G. Eidson and Associates." On July 27, 1955, they signed

a contract for the benefit of Charles A. McCormick, acting through his transfer agent, Floyd Herring, under which they agreed to transfer (ostensibly) to Herring the management contract with American Bankers for $170,000. The assignment was to be made effective on August 18, 1955. On the same date the directors of Western American Life Insurance Company authorized its officers to acquire by contract with American Bankers the right to reinsure all of its policyholders, except those designated as Group H,[1] for a payment to American Bankers of $156,000.

On the following date all of the partners of Eidson and Associates resigned their position as officers and directors of American Bankers. However, they elected their successors. The new directors of American Bankers then approved the assignment of the management contract from Eidson and Associates to Herring. Immediately thereafter a new meeting of the board of directors was called and it authorized the execution of the agreement of reinsurance, whereby Western American was to reinsure the policies of American Bankers. The contract was also to become effective on August 18, the date as of which the management contract was to be assigned to Herring. On August 18 the policyholders of American Bankers, apparently acting through Eidson and Associates as proxies, approved the reinsurance agreement; the directors transferred and assigned to Herring all of American Banker's right to receive $156,000 from Western American in return for Herring's relinquishment to American Bankers of all of his right, title and interest in the American Bankers management contract, which he had that day acquired from Eidson and Associates. Thereupon Herring immediately reassigned the right to receive Western American's $156,000 to Eidson and Associates, and delivered a money order for $14,000 to Eidson and Associates, making a total of $170,000, which he had agreed to pay them for the management contract.

Thus it is that Western American Insurance Company acquired the policies and business of American Bankers, and eliminated the management arrangement with Eidson and Associates, all as a result of a series of transactions completed on August 18, 1955.

The government has two prongs to its attack on the judgment of the trial court. It says, first, that the management contract, which was assigned to Herring, was not a capital asset, which, if sold or exchanged, would result in a capital gain to the taxpayer, and second, it contends that assuming that the contract rights owned by Eidson and Associates constituted a capital asset there was, nevertheless, no sale or exchange, but rather only a relinquishment by Eidson and Associates of a contractual right in favor of American Bankers Life Insurance Company.

Appellees, on the other hand, join issue as to both grounds, contending that their business enterprise of managing American Bankers was more than a service for a fee; that it was in fact a separate business from American Bankers Life Insurance Company, and that an assignment of it was both a sale or exchange and a sale or exchange of a capital asset.

As we approach a consideration of the basic questions in this case, it is helpful to remember what has many times been made clear by the Supreme Court—it is not every transfer for a consideration of property that gives rise to a capital gain. In Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, the Court said at page 134, 80 S.Ct. 1497 at page 1500, 4 L.Ed.2d 1617:

"While a capital asset is defined in § 117(a) (1) [of the Internal Revenue Code of 1939, the precursor of Section 1221] as 'property held by the taxpayer,' it is evident that not

---

1. Hereafter we will speak of the transfer and the dealings between the parties without reference to the exception as to Group H, since this exception has no bearing on the proper resolution of the questions on this appeal.

everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term 'capital asset' is to be construed narrowly * * *."

Thus, although the contractual right of taxpayer Lake to receive oil payments was undoubtedly property in the common acceptance of the term, the assignment of that right for a cash consideration was held not to give rise to a sale or transfer of a capital asset in Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed. 2d 743. It, therefore, furnishes no answer to our question here to decide that Eidson and Associates had a species of property in their contractual right to manage American Bankers Life Insurance Company on a profitable basis for ten years.

It is also no answer to our problem for the taxpayers here to point to the fact that whatever income they would receive during the life of the management contract would be the result of efforts put forth by them in carrying out their obligations to manage the business. Such was the situation in Roscoe v. Commissioner of Internal Revenue, 5 Cir., 215 F.2d 478, in which this Court affirmed a decision of the Tax Court. That Court found that a payment of some $25,000 to sellers of shares of a corporation's stock was in return for services performed by them or for their cancellation or termination of a partnership agreement with the corporation under which the partnership was to " 'manage and supervise all details in connection with the subdividing of the said land', and was to have the 'sole and exclusive right' to sell the lots," in return for which service it was entitled to a 10% commission. This Court held that the cancellation of such a contract involving service for a fee required a holding that the $25,000 payment represented ordinary income rather than a capital gain.

Conceptually, of course, it is difficult to describe any species of property or property rights owned by the taxpayer here that would meet the ordinary definition of a capital asset within the intendment of Section 1221 of the Internal Revenue Code. The Supreme Court has said in Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, at page 52, 76 S.Ct. 20, at page 24, 100 L.Ed. 29:

"The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended 'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' Burnet v. Harmel, 287 U.S. [103] at 106 [53 S.Ct. 74, 77 L.Ed. 199]. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term 'capital assets' in § 117. See Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 31 [61 S.Ct. 757, 85 L.Ed. 1168]; Kieselbach v. Commissioner of Internal Revenue, 317 U.S. 399, 403 [63 S.Ct. 303, 87 L.Ed. 358]."

■ It is, of course, not disputed here by the taxpayers that whatever net amount their contract would yield to them during the remaining life of the contract would be taxable to them as ordinary income. Therefore, if it be deemed, as we think it must, that the sum of $170,000, which they received for a transfer or assignment of their rights under the contract, represented their agreed amount as to the value of the contract to them, then the $170,000, in a very true sense, represented the present cash value of what would have otherwise been to them income received during the balance of the life of the con-

tract. The fact that, as pointed out by the taxpayers, this income would not be received by the taxpayer unless they performed the services which the contract required of them, that is, actively managed the affairs of the insurance company in a manner that would produce a profit after all of the necessary expenditures, does not, it seems clear, affect the nature of this payment. It affects only the amount. That is, the fact that the taxpayers would have to spend their time and energies in performing services for which the compensation would be received merely affects the price at which they would be willing to assign or transfer the contract. We think, therefore, that the language of the Supreme Court opinion in Commissioner of Internal Revenue v. P. G. Lake, Inc., supra, 356 U.S. at page 266, 78 S.Ct. at page 695, clearly describes the situation before the Court here:

"The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property."

The significance of the last clause of the quoted language can not be overlooked in light of the repeated statements by the Supreme Court as to the purpose underlying the capital gains provisions of the internal revenue laws. This purpose is reiterated in the Lake decision, where the Court, at page 265 of 356 U.S., page 694 of 78 S.Ct., says:

"The purpose of § 117 [the predecessor to the current section] was 'to relieve the taxpayer from. * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.' See Burnet v. Harmel, 287 U.S. 103, 106 [53 S.Ct. 74, 77 L.Ed. 199]."

Reference to Burnet v. Harmel makes more explicit what "excessive tax burdens" the section was intended to relieve. The Court there said at 287 U.S. 103, 106, 53 S.Ct. 74, 75:

"Before the Act of 1921, gains realized from the sale of property were taxed at the same rates as other income, with the result that capital gains, *often accruing over long periods of time*, were taxed in the year of realization at the high rates resulting from their inclusion in the higher surtax brackets. The provisions of the 1921 revenue act for taxing capital gains at a lower rate, reënacted in 1924 without material change, were adopted to relieve the taxpayer from these excessive tax burdens on gains resulting from a conversion of capital investments * * *." (Emphasis added.)

The Court repeated this thought explicitly in Commissioner of Internal Revenue v. Gillette Motor Co., 364 U.S. 130, where at page 134, 80 S.Ct. 1497 at page 1500 it was said:

"This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically *involving the realization of appreciation in value accrued over a substantial period of time*, and thus to ameliorate the hardship of taxation of the entire gain in one year. Burnet v. Harmel, 287 U.S. 103, 106, [53 S.Ct. 74, 77 L. Ed. 199]." (Emphasis added.)

The circumstances of the case before us do not, of course, in any way fit this typical definition. The taxpayers had a contract under which they took over control of 40% of all of the premium receipts of American Bankers, spent such amount as was necessary to operate the company, and retained the balance as income to themselves. While, of course, the sum of $170,000 which they received in the taxable year at issue was doubt-

less much larger than the income they received in any year for a current year's operation, this clearly resulted from the fact that they were assigning, and the assignee was acquiring, not a capital asset whose value had enhanced or accrued over several years, but the right to receive this net profit of operations during the remainder of the life of the contract.

Appellees urge on the Court that our recent decision in Nelson Weaver Mortgage Co. v. Commissioner of Internal Revenue, 5 Cir., 307 F.2d 897, supports their position as to the issue before us here. In that case the taxpayer held a contract with the New York Life Insurance Company, under the terms of which New York Life would buy such mortgages on real estate as it might select from those which had been placed by the taxpayer in a certain specified area in the state of Alabama. On all of such mortgages as were purchased by New York Life from the taxpayer, taxpayer was entitled to a fixed commission. The contract also provided for the payment to the taxpayer of a certain fixed service fee, in return for which it "serviced" the mortgages which had been acquired by New York Life. That is to say it collected the interest payments and principal payments and ascertained whether taxes and insurance were kept current by the mortgagors and the like. In explaining what species of property was actually transferred by the Nelson Weaver Mortgage Company in that case, the Court said:

"Cobbs-Allen purchased, therefore, not only the right to service approximately 1,830 mortgages, but it received from Mortgage Company all of the records and files which had been compiled over the years in connection with those mortgage loans. Cf. Rev.Rul. 55–79, 1955–1, Cum. Bull. 370. It obtained also the list of the approximately 1,600 mortgagors who had been the satisfied customers of Mortgage Company and who were figuratively tied to their agent through whom they had dealt through the years. These were a ready-made market, not only for future loans, but as prospects for the sale of homes, lease of apartments, sale of insurance on homes, automobiles and like items. Upon the completion of the sale Mortgage Company severed all connections with this large aggregation of mortgagors and turned over this valuable relationship, with all of its records, to Cobbs-Allen.

"It cannot be doubted that the sum total of the ingredients of this long-standing relationship with such a satisfied clientele constitutes a property right which is the equivalent of good will—the probability that the old customers will resort to the old place. Didlake v. Roden Grocery Co., 160 Ala. 484, 49 So. 384, 22 L.R.A.,N.S., 907 (1909). And it is equally plain that such a property right is a capital asset. [Aaron] Michaels, 12 T.C. 17, 19 (1949) acq. 1949–1 Cum.Bull. 3; [George J.] Aitken et al. 35 T.C. 227 (1960), and Cox (1952), 17 T.C. 1287. And, without dispute, the capital asset here involved had been held more than six months, the economic value having been building up over an eight year period and the contract then in force between Taxpayer and New York Life having been entered into May 5, 1953, prior to the sale on January 29, 1955."

Except to the extent that the Weaver Mortgage Company case can be sustained on the basis that there was there a sale of a property right equivalent to a sale of a business and good will, which really seems to be the ratio decidendi, that case would appear to be in conflict with the earlier Supreme Court decisions defining capital assets. We, therefore, distinguish it on the stated ground that there was a sale of a business including good will, a circumstance not present here.

We next consider the effect on this case of the earlier decision of this Court in Roscoe v. Commissioner of Internal Revenue, supra. As we have pointed out

above, the Roscoe case dealt with a sale by taxpayers of 40 shares of stock owned by them in a real estate corporation. In negotiating a sale of their stock, the taxpayers also agreed to cancel a contract which they held from the corporation under which the corporation agreed to subdivide a fifty acre tract into city lots and otherwise improve the property at its own expense, and the taxpayers, as partners, agreed "to manage and supervise all details in connection with the subdividing of said land," and it was to have the "sole and exclusive right" to sell the lots. For this service it was entitled to a 10% commission based on the sale price of the lots. To the extent that the price paid to the taxpayers for their stock exceeded the price which was paid to other stockholders who held no such contract with the corporation, the Tax Court found that the purchase price represented compensation paid to the taxpayers for services or for a cancellation of this contract. This Court affirmed that decision by the Tax Court, and held:

> "If, however, we assume arguendo that the substance of the transaction amounted to the payment of $25,345.41 as consideration for the cancellation of the sales contract, that sum was nevertheless ordinary income under Section 22(a) of the Internal Revenue Code, 26 U. S.C.A. § 22(a), and not capital gain under Section 117(a) (4) and (10)."

We conclude that the same principle should apply here. It makes no difference whether the assignment from Eidson and Associates to Herring is to be denominated a "sale" or not. The net and final result of the concurrent transactions was that Eidson and Associates received $170,000 compensation, and as the last of a series of transactions entered into practically simultaneously the management contract was cancelled by American Bankers upon its payment of the amount that ultimately compensated Eidson and Associates for the transfer. Thus, whether on the basis stated by this Court in the Roscoe case or because the property here transferred even if by "sale" is not the class of property which under the concept made clear by the Supreme Court does not constitute a capital asset, we conclude that the trial court erred in permitting a recovery of the tax paid on the ground that it should have been measured as for a capital gain rather than for ordinary income.

The judgment is reversed and the case is remanded for entry of judgment for the appellant.