ESTATE OF JOHN F. SHEA, DECEASED, GRACE A. SHEA, EXECUTRIX, AND GRACE A. SHEA, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2978–68—2984–68. Filed October 5, 1971.

---

[1] Cases of the following petitioners are consolidated herewith: Charles C. Valentine and Joan M. Valentine, docket No. 2979–68; Thomas J. Stevenson, Jr., and Virginia C. Stevenson, docket No. 2980–68; Ivan G. Ellis and Dorothy S. Ellis, docket No. 2981–68; Estate of Thomas J. Stevenson, Deceased, Thomas J. Stevenson, Jr., and First National City

*Howard A. Heffron* and *Charles B. Hochman*, for the petitioner.
*Stanley J. Goldberg* and *Michael K. Phalin*, for the respondent.

QUEALY, *Judge:* The Commissioner determined deficiencies in the Federal income tax of the petitioners as follows:

| Docket No. | Year | Deficiency | Addition to tax under sec. 6651(a) |
|---|---|---|---|
| 2978–68 | 1959 | $3,566.56 | |
| | 1960 | 155.69 | |
| 2979–68 | 1959 | 435,987.12 | |
| | 1960 | 3,257.26 | |
| | 1961 | 1,396.24 | |
| 2980–68 | 1959 | 131,955.93 | |
| | 1960 | 2,200.60 | |
| | 1962 | 1,719.82 | |
| 2981–68 | 1959 | 142,568.04 | |
| | 1960 | 4,961.42 | |
| | 1961 | 495.25 | |
| | 1962 | 1,110.17 | |
| 2982–68 | 1959 | 196,469.44 | |
| | 1960 | 2,381.38 | |
| | 1961 | 1,314.82 | |
| 2983–68 | 1962 | 382.17 | |
| 2984–68 | 1959 | 141,091.24 | |
| | 1960 | 3,352.07 | $167.61 |

With the mutual consent of the parties, the above-entitled cases have been consolidated for purposes of this opinion. All the issues presented in docket No. 2983–68 have been resolved by the concessions of the parties. As for the other docket numbers, concessions have been made by the parties; and, as a consequence, the sole issue presented for decision is whether the gain, which arose from the disposition of the Metropolitan Petroleum Co. tanker  voyage charter party by the Heron Steamship Co. on June 8, 1959, gave rise to ordinary income under section 61 or capital gain under section 1231(a).[2]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits thereto are herein incorporated by reference.

John F. Shea and Grace A. Shea were husband and wife who filed their joint Federal income tax return for the calendar year 1959 with the district director of internal revenue in Brooklyn, New York. John

Bank, Executors, and Estate of Helen V. Stevenson, Deceased, Thomas J. Stevenson, Jr., and Kenneth H. Stevenson, Executors, docket No. 2982–68 ; Estate of Thomas J. Stevenson, Deceased, Thomas J. Stevenson, Jr., and First National City Bank, Executors, and Christianna M. Stevenson, docket No. 2983–68 ; Kenneth H. Stevenson and Beverly E. Stevenson, docket No. 2984–68.

[2] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

F. Shea died on March 25, 1961. Grace A. Shea, petitioner herein, both in her individual capacity and as the executrix of her late husband's estate, legally resided in Garden City, N.Y., at the time the petition herein was filed.

Petitioners Charles C. Valentine and Joan M. Valentine, husband and wife, were legal residents of Manhasset, N.Y., at the time the petition herein was filed. They filed their joint Federal income tax return for the calendar year 1959 with the district director of internal revenue in the Manhattan District, New York, N.Y.

Petitioners Thomas J. Stevenson, Jr., and Virginia C. Stevenson, husband and wife, were legal residents of Plandome, N.Y., at the time the petition herein was filed. They filed their joint Federal income tax return for the calendar year 1959 with the district director of internal revenue in Brooklyn, New York.

Petitioners Ivan G. Ellis and Dorothy S. Ellis, husband and wife, were legal residents of Garden City, N.Y., at the time the petition herein was filed. They filed their joint Federal income tax return for the calendar year 1959 with the district director of internal revenue in the Manhattan District, New York, N.Y.

Thomas J. Stevenson died on January 28, 1968, and Helen V. Stevenson died on August 12, 1961. Thomas J. Stevenson, Jr., and the First National City Bank are petitioners who qualified as the executors of the Estate of Thomas J. Stevenson on February 13, 1968. Thomas J. Stevenson, Jr., and Kenneth H. Stevenson are petitioners who qualified as the executors of the Estate of Helen V. Stevenson on August 30, 1961. At the time the petition herein was filed, Thomas J. Stevenson, Jr., was a legal resident of Plandome, N.Y.; Kenneth H. Stevenson was a legal resident of Short Hills, N.J.; and the principal office of the First National City Bank was located in New York City, N.Y.

Petitioners Kenneth H. Stevenson and Beverly E. Stevenson, husband and wife, were legal residents of Short Hills, N.J., at the time the petition herein was filed. They filed their joint Federal income tax return for the calendar year 1959 with the district director of internal revenue in the Manhattan District, New York, N.Y.

During all relevant times, Ivan G. Ellis, John F. Shea, Helen V. Stevenson, Kenneth H. Stevenson, Thomas J. Stevenson, Thomas J. Stevenson, Jr., and Charles C. Valentine (hereinafter referred to as petitioners) were shareholders in Heron Steamship Co. (hereinafter referred to as Heron).

Heron was incorporated under the laws of the State of Delaware on February 13, 1957. Its Federal income tax returns were filed on the basis of a fiscal year ending on May 31. On June 3, 1959, Heron filed

a timely election, containing the consents of all of its shareholders, to be taxed under sections 1372–1378 as a small business corporation, pursuant to subchapter S of the Internal Revenue Code of 1954. The election was effective for Heron's taxable year ending May 31, 1960, the fiscal year in issue.

On June 10, 1957, Heron purchased a vessel S.S. *Valchem* (which had previously been named the *Calusa* and the *Valpont*) from Valentine Tankers Corp. (hereinafter referred to as Tankers), a wholly owned subsidiary of Metropolitan Petroleum Co. (hereinafter referred to as Metropolitan), which was in turn a wholly owned subsidiary of the Pittston Co. (hereinafter referred to as Pittston), a publicly held corporation whose stock was and is traded on the New York Stock Exchange. The consideration paid by Heron to Tankers for the ship (subject to the charter party discussed below) was $1,600,000.

At the time of the purchase, the *Valchem* was subject to a charter party dated May 1, 1953, between Tankers, as owner of the *Valchem*, and Metropolitan, as charterer. The charter party (hereinafter sometimes referred to as the Metropolitan charter) provided that Tankers would transport by sea for the charterer a cargo of "clean petroleum products" for a period of 5 years from and after the date of first loading.

The Metropolitan charter was a consecutive voyage charter, i.e., a charter, effective for as many voyages as could be completed within the term of the contract. It was contemplated by the parties that, under normal conditions, the *Valchem* would make at least 24 voyages per year. The Metropolitan charter also provided that the owner had the right to substitute as the hauling vessel another vessel of approximately the same size, type, speed, and position as the *Valchem*.

The rate payable by Metropolitan under the Metropolitan charter was specified to be the rate set out by the U.S. Maritime Commission in 1948 (hereinafter referred to as the USMC flat rate). That rate was $2.85 per ton per voyage. The USMC flat rate is recognized by the maritime industry as giving an owner of a vessel a fair return on his investment. Current charter rates are quoted in terms of percentages above or below the flat rate, thus reflecting any fluctuations in market conditions.

Charters similar to the Metropolitan charter are and were, during the taxable year in issue, traded on organized and established markets, such as the Baltic Exchange in London and the Maritime Exchange in New York. The rates at which ship charters are fixed fluctuate widely, depending upon the supply of available vessels and the demand for vessels by charterers. The demand for tankers varies greatly and is drastically affected by such extraneous events as the closing of the

Suez Canal and problems in negotiating oil agreements with Arab countries. During the period 1957 through 1959, the rate at which ships of the *Valchem* class were chartered for similar cargo fluctuated between a high of $9.348 per ton per voyage and a low of $1.826 per ton per voyage.

The market value of an existing long-term charter with a fixed rate, such as the Metropolitan charter, will also vary, depending upon the fluctuation in charter rates. When the rate for new charters is substantially above that set in an existing charter, the existing charter will have little or no market value. On the other hand, when the rate in an existing charter exceeds the then current rate for new charters, the existing charter can be extremely valuable in terms of potential sale in the existing market.

At the time of the purchase of the *Valchem* and the Metropolitan charter by Heron from Tankers, the charter party was subject to the terms and conditions of a space charter entered into between Tankers and E. I. duPont de Nemours & Co. (hereinafter referred to as duPont) on April 23, 1953. Under the terms of the space charter, Tankers had agreed to charter to duPont approximately one-third of the capacity of the vessel for the purpose of transporting petroleum products, commencing January 1, 1954, and continuing for a period of 5 years thereafter. The space charter was also assigned to Heron from Tankers.

On the date Heron purchased the *Valchem*, June 10, 1957, there was executed addendum No. 1 to the Metropolitan charter, substituting Heron for Tankers. It provided in pertinent part:

1. * * * [Heron] shall be considered the Owner of the Vessel under the Charter * * * and shall be, and hereby is, bound and agrees to perform the Charter as Owner in the place and stead of [Tankers], to the same extent and with the same effect as if [Heron] had been the original party thereto as Owner, as such term is used in the Charter, and the Charter shall be considered amended as of date and time of the delivery of the Vessel to [Heron] so as to name [Heron] therein as such Owner, and [Tankers] shall be and is hereby discharged and released from any and all duties and obligations accruing under the Charter * * *

2. [Heron] shall and hereby does assume all obligations of [Tankers] under the Charter, * * *

3. [Metropolitan] shall be and hereby is discharged from any liability to [Tankers] under the Charter, * * *

On the same date, there was executed a guaranty by Pittston to Heron, which provided in pertinent part:

In order to induce Heron Steamship Company to assume the obligations of the Owner under the annexed charter of the VALCHEM, dated May 1, 1953, and to enter into the addenda Nos. 1 and 2 to said charter, [Pittston] guarantees absolutely and unconditionally to Heron Steamship Company the due and

punctual performance by Metropolitan Petroleum Corporation of all of its obligations thereunder * * *

Also on June 10, 1957, there was executed addendum No. 2 to the Metropolitan charter. It provided in pertinent part:

1. The Charter shall be and is hereby extended for a further period of five (5) years from and after the date of expiration therein provided, upon the same terms and conditions as set forth therein, as amended by the Addendum No. 1 referred to above, and with the further proviso that if at any time hereafter, E. I. duPont de Nemours & Company should for any reason, whether or not justified under the provisions of its space charter of the Vessel dated April 23, 1953, fail to provide cargoes thereunder or to perform under the provisions of the said space charter, or fail to exercise any option in it to renew or extend the term of the said space charter, then, and in any of such events, Charterer shall thenceforth take over the use of the entire carrying capacity of the Vessel, for any remaining period of the Charter or of any extended period thereof, and shall thenceforth pay freight or dead freight on the entire cargo carrying capacity * * * set forth in former U.S.M.C. T/2 Orders and Rate Advices in effect June 30, 1948, plus fifteen (15%) per cent thereof * * *

On September 30, 1957, the term of the Metropolitan charter was extended for an additional 6 months.

In December 1958, duPont served notice on Heron that it would not renew the duPont space charter, which accordingly expired by its terms on December 31 of that year. As a consequence, under the provisions of addendum No. 2 to the Metropolitan charter, Metropolitan became obligated to and did pay for the entire capacity of the *Valchem* at the rate of $3.2275 per ton per voyage from and after January 1, 1959.

During the latter part of 1958, charter rates had declined significantly and the Metropolitan charter accordingly had a high market value. At that time, Heron's management decided to attempt to sell the *Valchem* and the Metropolitan charter. Heron began negotiations and, in February 1959, had reached a written agreement to sell the Metropolitan charter and the *Valchem* to Marine Transport Service Corp. for $2,130,000. This sale was never consummated. On March 26, 1959, the *Valchem* suffered extensive damage in a collision with another ship, the S.S. *Santa Rosa*. The *Valchem* was declared a constructive total loss. Pursuant to such loss, Heron collected $1,343,250, the full insured value of the vessel, from its insurer.

On its Federal income tax return for the taxable year ended May 31, 1959, Heron reported the excess of the insurance proceeds over its adjusted basis for the *Valchem* as gain from the sale or exchange of a capital asset held for more than 6 months. Upon audit of this return, the district director issued a 30-day letter, dated October 6, 1964, in which he assigned a basis of $1,400,000 to the *Valchem*. In the same letter, he also assigned a basis of $200,000 to

the Metropolitan charter as of June 10, 1957, and allowed a deduction for amortization based on this value.

Pursuant to its right under the Metropolitan charter to substitute a new ship, Heron chartered the S.S. *Georgetown* for a period of approximately 90 days from Ocean Freighting & Brokerage Corp. (hereinafter referred to as Ocean Freighting) and substituted that ship under the charter effective approximately March 30, 1959. The destruction of the *Valchem*, however, accentuated Heron's prior decision to dispose of its entire interest in the vessel and the charter.

As a consequence, Heron began negotiating for a sale of the Metropolitan charter. Pursuant to an agreement dated June 8, 1959, Heron sold the Metropolitan charter to Ocean Freighting for $1,300,000. Of this amount, $39,136 was paid in cash, and the balance of $1,260,846 was paid by the purchaser delivering its notes payable over a 3-year period. Heron distributed these notes to its stockholders during the calendar year 1959.

On its Form 1120–S for the taxable year ending May 31, 1960, Heron treated the sale of the Metropolitan charter as giving rise to a gain taxable as gain from the sale of a capital asset held for more than 6 months.

In his notice of deficiency, the Commissioner determined that the gain from the sale of the Metropolitan charter was taxable as ordinary income rather than as long-term capital gain.[3]

## OPINION

The sole issue in this case is whether the gain which arose from the disposition of the Metropolitan charter by Heron on June 8, 1959 gave rise to ordinary income or capital gain.

Respondent contends that "the rights held by Heron Steamship Company pursuant to the Tanker Voyage Charter Party with Metropolitan Petroleum Company were not capital assets for purposes of capital gains treatment" under sections 1221 [4] and 1222.[5]

---

[3] Heron originally elected to report the gain on the installment method pursuant to sec. 453. For its year ending May 31, 1960, petitioners recognized only the long-term capital gain attributable to the cash it received. In his notice of deficiency, the Commissioner determined that the distribution of the notes by Heron constituted a "disposition" of installment obligations under sec. 453(d)(1), which resulted in the deferred gain being immediately taxable to Heron. Petitioners do not now contest this determination, nor do they contest the determination that they received dividend income to the extent the distribution received by each of them exceeded his distributive share of Heron's taxable income for its year ending May 31, 1960.

[4] Sec. 1221 provides in pertinent part:

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

\* \* \* \* \* \* \*

(2) property, used in his trade or business, of a character which is subject to the

The respondent advances two different theories in support of this conclusion. First, he contends that when Heron sold the Metropolitan charter to Ocean Freighting, it disposed of only "the right to earn future income." On this basis, the respondent insists that this transaction does not qualify as a sale of "property" within the meaning of section 1221 and therefore does not meet the statutory definition of a capital asset.

The respondent also claims that the transaction between Heron and Metropolitan was not a "sale or exchange," which section 1222 requires in order for a transaction to receive capital gain treatment.

Second, and in the alternative, the respondent insists that the Metropolitan charter was originally acquired with the intention that it would serve as an integral part of Heron's regular business activities. Consequently, the respondent concludes that the sale of the Metropolitan charter by Heron produces ordinary income under the rationale of *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46 (1955).

The petitioners willingly concede that the sale of the Metropolitan charter was not the sale of a capital asset under sections 1221 and 1222.[6] However, they maintain that it was "property" used in the trade or business within the meaning of section 1231(b)(1).[7]

Moreover, the petitioners insist that the transaction pursuant to which Heron sold the Metropolitan charter to Ocean Freighting constituted a "sale or exchange." On this basis, the petitioners conclude that the sale resulted in a gain taxable to Heron and hence to themselves as long-term capital gain within the meaning of section 1231(a).[8]

---

allowance for depreciation provided in section 167, or real property used in his trade or business;

\* \* \* \* \* \* \*

[5] Sec. 1222 provides in pertinent part:
For purposes of this subtitle—

\* \* \* \* \* \* \*

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.

[6] We agree with petitioners as to this point. Assuming *arguendo* that the Metropolitan charter is "property" within the meaning of sec. 1221, it is clear that sec. 1221(2) would preclude capital asset treatment for said charter since it was clearly "property" used in Heron's trade or business—ownership and operation of a ship.

[7] Sec. 1231(b)(1) provides in pertinent part as follows:
(1) GENERAL RULE.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, \* \* \* which is not—
(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, \* \* \*

[8] Sec. 1231(a) provides in pertinent part:
(a) GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the

If we assume that the Metropolitan charter is "property" as that term is used in section 1231(a), it clearly meets the requirements of section 1231(b)(1). The charter was (a) held by Heron for more than 6 months; (b) used in Heron's trade or business; (c) not inventory or property held by Heron for sale to customers; and (d) "of a character subject to depreciation." With respect to the latter point, the Commissioner, on audit of Heron's returns, insisted upon assigning a separate cost basis to the Metropolitan charter of $200,000 and allowed amortization of this cost. It has long been established that an amortizable item is "of a character subject to depreciation" as required under section 1231(b). *John D. Fackler*, 45 B.T.A. 708 (1941), affd. 133 F. 2d 509 (C.A. 6, 1943); *Tom F. Baker III*, 38 T.C. 9 (1962).

The Court is thus faced with the question of whether the charter constituted property within the meaning of section 1231(a) and, if so, whether the transaction in question constituted a "sale or exchange" of that property. Considering these questions, we are faced at the outset with the fact that the respondent, in the examination of Heron's income tax return for the year ended May 31, 1959, treated $200,000 of the total of $1,600,000 paid by Heron for the ship and the charter as allocable to the cost of the charter. If the charter did not constitute "property," the respondent was in error in making that allocation. Nevertheless, the respondent now contends that, for the purpose of characterizing gain realized on the sale of the charter, a different rule should apply. The respondent would treat the charter not as "property," but as a "bundle of rights" equivalent to the right to earn future income. From this, the respondent argues that the gain from the sale of the charter was ordinary income, citing *Commissioner* v. *Ferrer*, 304 F. 2d 125 (C.A. 2, 1962), reversing in part 35 T.C. 617 (1961); *United States* v. *Holt*, 303 F. 2d 687 (C.A. 9, 1962); *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962); *Bisbee-Baldwin Corp.* v. *Tomlinson*, 320 F. 2d 929 (C.A. 5, 1963).

Admittedly, characterization of the contract in question—the Metropolitan charter—is difficult. The contract is unique in form and peculiar to the practice of the shipping industry. In our opinion, however, the respondent correctly treated the charter as "property" when it was acquired by Heron, and he should be held to that determination

---

compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

Heron had no other gains or losses described in section 1231(a) for the taxable year in question.

in the treatment of the resulting gain when the charter was sold by Heron. The practice in the industry strongly supports this conclusion.

Heron bought the charter party for $200,000. This was the value or cost assigned to the acquisition of the contract by the respondent and is not challenged in this case. Heron subsequently sold the same contract, or the unexpired term thereof, for $1,300,000. The appreciation in value was not attributable to any change in the projected income which would result from making the voyages pursuant to the contract. Instead, the appreciation in value resulted from conditions existing in the world market for charters.

Charter rates are dependent upon the worldwide supply of vessels in relation to the demands of shippers. As was stated by Edward F. Stevens in Shipping Practice, ch. VII, pp. 40–41 (9th ed. 1970).

the rates for chartered ships fluctuate according to the state of the market, it being the tendency for rates to be high during busy periods, when tonnage is scarce, and low in slack times when idle ships are plentiful.

\*  \*  \*  \*  \*  \*  \*

Brokers are constantly in touch with the world's markets through the medium of the Baltic Exchange and can keep their principals—perhaps shipowners, perhaps merchants—advised of the daily trend of the markets and whether conditions tend toward rises and falls in rates, which fluctuations operate on the law of supply and demand \* \* \*

When they negotiate, the hauler and the charterer each estimate the supply of vessels and the availability of cargoes over the period to be covered by a charter. Fortunes in the maritime industry are made and lost based on the accuracy of such estimates. So, when a charter party is disposed of, its value is not primarily due to the inherent "right to earn future income" within it. Rather, the value of a given charter party is determined by its rate as compared to the prevailing market rates which in turn are determined by the estimated supply of vessels and the projected availability of cargoes for that supply. When the rate for new charters is substantially above that set in an existing charter, the existing charter will have little or no market value. On the other hand, when the rate in an existing charter exceeds the then current rate for new charters, the existing charter will be an asset of substantial value and may be sold in the market.

During the latter part of 1958, charter rates had declined significantly. The rate of the Metropolitan charter exceeded the current rate for new charters during that period. Consequently, it had a high market value. Thus, the Metropolitan charter was subject to the risks of impersonal market forces completely outside of the control of Heron. Only because of these market conditions was Heron able to realize the gains in issue.

Thus, the difference between the amount paid for the charter and the amount received upon its disposition represented appreciation in value over time, due purely to the action of market forces. This is precisely the type of profit for which capital gain treatment is intended. See *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130, 134 (1960), where the Court stated that the basic purpose of the capital gain provisions is to apply a lower rate of tax to—

* * * situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. * * *

*United States* v. *Holt*, *supra*, *United States* v. *Eidson*, *supra*, and *Bisbee-Baldwin Corp.*, *supra*, are readily distinguishable. Those cases involved the sale of a contract to perform personal services. The "personal" element was wholly lacking in the Metropolitan charter. In fact, while the vessel was identified, the right of substitution was freely granted.

As a practical matter, the sale of intangible property, whether it be a patent, a copyright, a franchise, a license, a delivery route, or a ship charter, carries with it the right to earn future income. It is this right which gives value to the property. It does not necessarily follow, however, that the sale of such property results in the realization of ordinary income. See *Harry F. Guggenheim*, 46 T.C. 559, 569 (1966), acq. 1967–2 C.B. 2, in which this Court stated:

Simply because the property transferred will produce ordinary income, and such income is a major factor in determining the value of the property, does not necessarily mean that the amount received for the property is essentially a lump-sum substitute for ordinary income. * * *

Respondent also places great reliance on *Commissioner* v. *Ferrer*, *supra*. We do not believe that we are constrained to reach a contrary result by the decision in *Ferrer*. That case involved rights under a dramatic production contract derived by Ferrer from his personal services. The facts in that case were as peculiar to that field as the facts in the case before the Court are to the shipping industry. The talents of the taxpayer in *Ferrer* were not bought and sold in the marketplace. Ship charters are bought and sold regularly and on a strictly impersonal basis.

While relying in part on the decision in *Ferrer*, respondent would, contrary to that opinion, exclude the transaction before the Court from the applicability of the capital gains provisions on the ground that there was no "sale or exchange" within the meaning of section 1231 (a). The facts negate respondent's argument. When we we look to the transaction as a whole, we find a sale of Heron's rights under the charter to Ocean Freighting for cash and notes. The latter acquired precisely

the same rights and obligations which Heron possessed prior to the sale. However, even if the transaction is regarded as a release of its rights by Heron and the creation of a new charter running to Ocean Freighting, the Court in *Ferrer* would reach the same result. It is the substance and not the form of the transaction which is controlling. See Eustice, "Contract Rights, Capital Gain, Assignment of Income," 20 Tax L. Rev. 1 (1964).

The respondent alternatively argues that capital gain treatment is precluded under the rule of *Corn Products* v. *Commissioner, supra,* and *Hollywood Baseball Association,* 42 T.C. 234 (1964), affd. 352 F. 2d 350 (C.A. 9, 1965), vacated and remanded 383 U.S. 824 (1966), on remand 49 T.C. 338 (1968), affd. 423 F. 2d 494 (C.A. 9, 1970), certiorari denied 400 U.S. 848 (1970).

In *Corn Products,* a manufacturer of products made from grain corn made regular purchases of corn futures as part of its program to insure an adequate supply of raw materials for its manufacturing operations. The Court held that the sale of the corn futures by the manufacturer produced ordinary income, even though the property literally conformed to the definition of a capital asset under what is now section 1221. The Supreme Court concluded that the "congressional purpose" was to preclude capital gain treatment from purchase and sale transactions that are essentially a part of the taxpayer's "everyday business transactions." *Hollywood Baseball Association, supra,* held that the *Corn Products* doctrine was applicable not only to section 1221 assets but also to section 1231 assets.

As distinguished from *Corn Products,* the sale of the Metropolitan charter was not a regular transaction as a part of the business of Heron. In fact, it was highly unusual, the sale of the charter separately resulting solely from the destruction of the vessel by accident. The sale stemmed from the decision of Heron to cease business.

In no sense could the sale of the Metropolitan charter be considered a transaction which for Heron was "the normal source of business income." Consequently, the *Corn Products* rationale is obviously inapplicable to this case. As a result, it is not necessary to decide whether the *Corn Products* theory can also be applied to section 1231 assets. See *Hollywood Baseball Association, supra.*

We accordingly conclude that the sale of the Metropolitan charter by Heron to Ocean Freighting produced capital gain under section 1231(a). The total amount of gain is the difference between the amount realized on the sale and the adjusted basis of the charter at the time of such sale.

*Decision will be entered under Rule 50.*