*Decision will be entered under Rule 50.*

WALTER J. ROOB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MARY S. ROOB, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4126–66, 4127–66. Filed September 17, 1968.

*Laurence H. Nichols,* for the petitioners.
*Denis J. Conlon,* for the respondent.

WITHEY, *Judge:* Respondent determined deficiencies in petitioners' income tax for the years and in the amounts as follows:

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Walter J. Roob | 4126–66 | 1962 | $1,469.89 |
| | | 1963 | 1,636.69 |
| | | 1964 | 2,926.71 |
| Mary S. Roob | 4127–66 | 1962 | 3.99 |
| | | 1963 | 17.45 |
| | | 1964 | 20.34 |

The cases have been consolidated and will be decided together.

The issues presented for our determination are:

(1) Whether respondent correctly reallocated dividends received by the shareholders of Roob Studio, Inc., in order to reflect the value

of services rendered to the corporation by Walter J. Roob, a shareholder.

(2) Whether the $1,000 received in 1964 by Roob Studio, Inc., in accordance with the "franchise agreement" entered into with Donald and Marilyn Wick, is subject to tax as gain on the sale or exchange of a capital asset or as ordinary income.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Walter J. Roob (hereinafter Walter) and Mary S. Roob (hereinafter Mary), husband and wife, were residents of Milwaukee, Wis., during the taxable years in question, 1962 through 1964.[1] During those years, petitioners filed separate Federal income tax returns with the district director of internal revenue at Milwaukee, Wis.

For a number of years prior to February 28, 1962, petitioners operated a photography studio in Milwaukee, Wis., as a partnership known as Roob & Roob. From March 1, 1962, to the present time, the business formerly operated by the partnership of Roob & Roob has been operated by a corporation known as Roob Studios, Inc. (sometimes hereinafter referred to as the studio), an electing small business corporation within the meaning of section 1371 of the 1954 Code.[2] For the taxable years ended December 31, 1962, 1963, and 1964, the corporation filed Federal income tax returns as a small business corporation with the district director of internal revenue, Milwaukee, Wis.

Upon the incorporation of Roob Studio, Inc., on February 12, 1962, Walter and Mary each received 60 shares of the studio's stock in exchange for their partnership assets. On or about the same date, the studio issued 60 shares of its stock to each of Walter and Mary's seven children, and upon the birth of their eighth child, an additional 60 shares was issued to him on August 24, 1964. The amount of dividends received by each shareholder during the years in question was as follows:

| | |
|---|---|
| 1962 | $1,047.74 |
| 1963 | 528.86 |
| 1964 | 2,450.67 |

The entire stock of the studio is owned by the petitioners and their eight children. Although petitioners are the only two shareholders who render services to the studio, dividends in the form required by section

---

[1] The 1962 taxable year was from Mar. 1 to Dec. 31. The year 1963 and 1964 taxable years coincided with the calendar year.

[2] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

1373 of the Code [3] were included in the gross income of each of the corporate shareholders for the years in question. In the case of petitioners' children, separate savings accounts were maintained for them into which were deposited the corporate dividends paid upon their stock.

Walter has been a professional photographer since 1941 when he was employed by Schroeder Studios during the Christmas season. His education in photography consisted of attendance at Milwaukee Vocational School, Art Center School of Photography in Los Angeles, Army Air Force School in Lowry Field, Colo., and graduation from both Les Vogue School of Photography in Chicago and the Monona School of Photography in Indiana. While at Lowry Air Force Base, he learned all phases of photographic background and camera repair, later becoming an instructor of motion-picture photography as it related to Air Force gunsight equipment. Walter's instructorship at Lowry Field lasted for 5 or 6 months, after which period he was sent to England to assist in establishing a special type of reconnaissance base which employed new theories of photographic coverage utilizing high-speed aircraft at low altitudes. He engaged in the project until V-E Day. After leaving the service, Walter was yearbook photographer for Marquette University from late 1945 through 1949, being employed as a student photographer doing work for Marquette's School of Journalism.

Mary has been a professional photographer since 1943. While in high school, she began working in the photography department at two mercantile establishments. After high school graduation and during her freshman year in college, she did photography work on a part-time basis. She subsequently went to the professional photography department of Layton School of Art for 3 years. Following that, she worked at a photography studio for a short time until she married Walter in October 1949.

Shortly after their marriage, petitioners began their photography business, working out of their home. In the following year, 1950, they opened a studio in Milwaukee, Wis., which location is still used by

[3] SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS.

(a) GENERAL RULE.—The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

(b) AMOUNT INCLUDED IN GROSS INCOME.—Each person who is a shareholder of an electing small business corporation on the last day of a taxable year of such corporation shall include in his gross income, for his taxable year in which or with which the taxable year of the corporation ends, the amount he would have received as a dividend, if on such last day there had been distributed pro rata to its shareholders by such corporation an amount equal to the corporation's undistributed taxable income for the corporation's taxable year. For purposes of this chapter, the amount so included shall be treated as an amount distributed as a dividend on the last day of the taxable year of the corporation.

them to conduct their photography business. Petitioners have devoted full time to the development of the business, relying on fulltime domestic help to assist in the care of their children. Mary's responsibilities in the business include performing approximately 95 percent of the studio's printing work, as well as photographic retouching and photographic coloring with brush oils and light oils. She also closely supervises the various photographic techniques carried on in the studio to assure quality control. In addition, she assists Walter in obtaining new accounts and in selling their services generally, although they also rely on other employees to sell. Basically, each petitioner attempts to complement the work of the other in the business.

As a result of long hours and hard work by both petitioners, their photography business has grown into a successful operation. The high quality of their work is evidenced by the receipt of numerous awards by the studio, including an award of Photographic Craftsmen which, at the time it was made, was one of only 44 in the world. The studio has also received print awards almost every year, as well as awards for petitioners' speaking engagements on various panels, including the National Association of Photographers of America, and various other associations in Canada and the United States. The studio also maintains membership in a number of professional societies, including the Professional Photographers of America, the Wisconsin Professional Photographers Association, and the Greater Milwaukee Photographers. Two of the associations to which petitioners belong are established for masters of photography and photographic craftsmen, membership therein being by invitation only.

During the years in question, the studio reported net sales, gross profit, and taxable income as follows:

| Year | Net sales | Gross profit | Taxable income |
|---|---|---|---|
| 1962 | $129, 546. 89 | $64, 256. 61 | $9, 429. 71 |
| 1963 | 179, 802. 36 | 72, 522. 52 | 4, 759. 72 |
| 1964 | 199, 554. 97 | 86, 480. 35 | 24, 506. 69 |

For these same years, the studio claimed a deduction for compensation paid to petitioners, as corporate officers, in the following amounts:

| Petitioner | Year | Compensation paid |
|---|---|---|
| Walter (president-treasurer) | 1962 | $10, 000 |
|  | 1963 | 12, 000 |
|  | 1964 | 12, 000 |
| Mary (vice president-secretary) | 1962 | 10, 000 |
|  | 1963 | 12, 000 |
|  | 1964 | 12, 000 |

In his notice of deficiency to Walter, the Commissioner determined that the reasonable compensation due Walter by the studio for each of the years in question should be increased as follows:

| Year | Compensation claimed on corporation return | Compensation deemed reasonable by Commissioner | Amount of increase |
|---|---|---|---|
| 1962 | $10, 000 | $14, 000 | $4, 000 |
| 1963 | 12, 000 | 17, 000 | 5, 000 |
| 1964 | 12, 000 | 20, 000 | 8, 000 |

Pursuant to section 1375(c) of the Code,[3] the Commissioner then reallocated the dividends received by the studio's shareholders to reflect the increased compensation determined to be due Walter. Such "increased compensation" is reallocated to Walter as dividends.

At some point in time, undisclosed by the record, Roob Studio entered into a studio agreement with Family Record Plan, Inc., of Los Angeles, Calif. (hereinafter referred to as the Record Plan). The substantive portions of that agreement are as follows:

1. You [Record Plan] are engaged in the business of selling to ultimate users photographic albums in combination with certificates for photographic services. The two plans being sold by you are: (a) a hand bound leather 12½ x 14 inches album containing frames to mount fourteen (14) portraits and paper to mount snapshots, together with a certificate valid for fourteen (14) portraits; and (b) the hand bound leather 12½ x 14 inches album containing frames to mount sixteen (16) portraits and paper to mount snapshots, together with a certificate valid for sixteen (16) portraits.

2. In consideration of your designating us as the customer's portrait studio and as an inducement to you to do so, we hereby agree that we will honor all certificates issued by you in which we are designated; and that we will also honor all of said certificates which are assigned or reassigned to us whether or not we were originally designated. Honoring the certificates with respect to each sitting provided for in the certificate shall consist of the following: taking and showing not less than four (4) proofs of any member of the customer's family; making and furnishing one portrait 8 x 10 inches in tone finish of the proof selected by the customer; not making any charge to or imposing any obligation upon the customer for the foregoing. Of the total portraits to which each customer is entitled, one will be a family group.

3. We acknowledge that we derive valuable advertising benefits from being designated as the customer's portrait studio. It is understood that we receive and retain all benefits derived in the event the customer purchases reprints.

---

[3] SEC. 1375. SPECIAL RULES APPLICABLE TO DISTRIBUTIONS OF ELECTING SMALL BUSINESS CORPORATIONS.

(c) TREATMENT OF FAMILY GROUPS.—Any dividend received by a shareholder from an electing small business corporation (including any amount treated as a dividend under section 1373(b)) may be apportioned or allocated by the Secretary or his delegate between or among shareholders of such corporation who are members of such shareholder's family (as defined in section 704(e)(3)), if he determines that such apportionment or allocation is necessary in order to reflect the value of services rendered to the corporation by such shareholders.

4. We acknowledge that you have a valuable good will and are highly regarded by the general public and that there is a likelihood of confusion should we simultaneously participate in any similar album photographic plan. We represent that we will not use or participate in or agree to use or participate in any similar album photographic plan during the existence of this agreement and that we will honor only genuine certificates issued by you.

5. This agreement may be cancelled with or without cause by either party upon giving not less than sixty (60) days' notice in writing to the other party of the intention and election so to do. Such notice shall be given by being deposited in the United States mail addressed to the party to whom it is directed, postage prepaid and registered or certified. Notice to you shall be addressed to Family Record Plan, Incorporated, 2015 West Olympic Boulevard, Los Angeles 6, California, or in such other manner or to such other place as you may from time to time designate in writing. Notice to us shall be addressed to us at the address appearing at the end of this letter agreement, or in such other manner or to such other place as we may from time to time designate in writing.

6. It is distinctly understood and agreed that in the event this agreement is cancelled for any cause whatsoever, we shall be required to complete the full series of either fourteen (14) or sixteen (16) portraits of all of your customers whose certificates were written upon, assigned to or reassigned to us prior to the effective date of cancellation.

7. This agreement shall apply to you and your predecessor and to us and our predecessor, if any, and shall be binding upon and shall inure to the benefit of the heirs, executors, administrators, successors and assigns of the parties hereto, and shall be binding upon and shall inure to the benefit of the successors to the business or good will of the parties hereto whether or not expressly assigned or assumed. No assignment, either voluntary or by operation of law, shall relieve the parties of their contractual liability hereunder. This agreement contains the entire understanding and agreement of the parties.

In September 1964, the studio entered into an agreement entitled "Franchise Agreement" with Donald and Marilyn Wick. That agreement recited that Donald Wick was an experienced photographer, that the studio operated under a franchise agreement called the Family Record Plan, and that the Studio had offered and the Wicks had agreed to accept the Studio's franchise rights to operate the Family Record Plan for the stated consideration of $7,000. Of the total contract price, $1,000 was to be paid upon the execution of the agreement and the balance in monthly installments, as follows:

WICK shall pay to ROOB at the end of each and every four week period ten per centum (10%) of the gross proceeds received by them from sales made in the operation of the Family Record Plan business. It is understood that the income received because of work in progress may not equal the sales made during the said four week period. The said installments of ten per centum (10%) shall continue until the balance of Six thousand ($6,000.00) Dollars is paid in full.

The remainder of the agreement provided as follows:

4. WICK agrees to open a checking account at the Vliet Street Office of the First Wisconsin National Bank and to deposit all funds received from their customers under the Family Record Plan Agreement and agree to withdraw

funds from said account, unless otherwise agreed in writing with ROOB, only at the end of each such four week reporting period. All funds in said checking account shall be disbursed in the following manner:

a. Ten percentum (10%) thereof to ROOB for payment of the balance due on this agreement;

b. Sixty-six per centum (66%) thereof to ROOB for the rental and other overhead expenses as hereinafter set forth;

c. Twenty-four per centum (24%) thereof to WICK representing their net from the business operations for that period.

5. The franchise herein above granted to WICK shall include the following services to be rendered by ROOB:

a. Assist WICK in making plans for studio layout;

b. Complete the studio area ready for operation of the Family Record Plan business;

c. Provide practical training and counseling to WICK on photography, sales and management of the Family Record Plan;

d. Provide WICK with ROOB quality portrait finishing laboratory services for WICK'S customers under the Family Record Plan.

6. The complete physical facilities for the conduct of photography services to be carried on by WICK under this franchise agreement shall be furnished by ROOB including rental area, use of designated camera equipment, all utilities, finishing of all photographs taken by WICK, provide all film for such photography and cover the payment of licenses that may be required and for all these services WICK agrees to pay ROOB sixty-six per centum (66%) of the gross income realized by WICK in carrying out business under this franchise agreement. The aforesaid percentage payment shall be made in accordance with paragraph 4 above.

7. In the event Wick defaults in any of their obligations under this Agreement and such default continues for ten days after written notice from Roob of such default, this franchise agreement, shall at the option of Roob be terminated. Upon receipt of such notice of default Wick shall immediately discontinue business operations, provide Roob with a final, complete and accurate accounting of the entire business operations, including all work under contract or in progress, credits shall be adjusted according to such final accounting and Wick shall vacate the premises. Wick shall make the required disbursements set forth in paragraph 4 above within three (3) business days after the end of the 4 week reporting period. If the required disbursements to Roob are not made on this required date this agreement shall be considered in default.

8. Wick agrees to provide Roob with a daily and weekly report of all Family Record Plan business, both sales and income; at the end of each required 4 week reporting period Wick shall provide Roob with a complete, accurate and itemized report of all sales made, income received and work in progress. Roob shall have the right to inspect the checking account and all business records of the Family Record Plan business conducted by Wick under this Agreement.

9. The parties further agree that in the event that this Agreement is terminated as hereinabove provided all funds theretofore paid by Wick shall be the sole property of Roob; all remaining payments payable upon the aforesaid $6,000.00 shall be cancelled and Wick shall pay Roob the sum of $1,000.00 liquidated damages.

In his notice of deficiency, the Commissioner determined that the $1,000 received by the studio from the Wicks on the "Franchise Agree-

ment" and reported as capital gains income on the studio's 1964 small business corporation return constituted ordinary income. As a result, each petitioner's ordinary income for 1964 was increased by $100 and their respective capital gains income for that year was decreased by the same amount.

OPINION

During the taxable years in question, Walter received a salary from the studio, a subchapter S corporation, in the amount of $10,000 for 1962, and $12,000 for each of the years 1963 and 1964. Pursuant to the authority vested in him by section 1375 (c) of the Code, respondent determined that the reasonable value of Walter's services to the studio for those years was $14,000 for 1962, $17,000 for 1963, and $20,000 for 1964. The result of that determination was to increase Walter's income for services rendered to the studio and decrease the amount of dividend income attributable to each of the other studio shareholders as follows:

| Year | Dividend reported by each shareholder (before allocation) | Sec. 1375(c) dividend after allocation |
| --- | --- | --- |
| 1962 | $1,084.99 | $640.55 |
| 1963 | 587.03 | 31.48 |
| 1964 | 2,415.44 | 1,615.44 |

In determining the correctness of the foregoing allocation and the resulting deficiency, we must recognize that respondent's determination carries with it a presumption of correctness and that in order for petitioners to prevail, they must prove by a preponderance of the evidence that the determination is incorrect.

No cases have been cited, nor are we aware of any, where the Commissioner has increased a petitioner's salary under section 1375(c). To the contrary, where a deficiency determination is made under section 162(a) (1), relating to business deductions for "a reasonable allowance for salaries or other compensation for personal services actually rendered" the Commissioner ordinarily attempts to disallow, as a business deduction, some part of the salary paid to a shareholder of a close corporation on the ground that the amount paid was excessive. While we are confronted with the other side of the coin in the instant case, attempting to determine whether the value of Walter's services to his corporation was greater than the salary he received, the criteria relied on in deciding the issue under section 162(a) (1), i.e., reasonableness of salary, would seem to apply with equal force in the instant case. Thus, the nature of the services performed, the responsibilities involved, the time spent, the size and complexity of the business, prevailing economic conditions, compensation paid by comparable firms for comparable services, and salary paid to company officers in prior years are all relevant in determining whether the salary received by Walter was

reasonable.[4] Although both petitioners testified extensively regarding their formal education and practical experience prior to forming their photography business in 1949, there is a virtual absence of any evidence regarding Walter's role in the business during the years in question from which we might find for petitioners. On the other hand, the facts in evidence portray a family business that has developed over a period of 13 to 15 years as a result of the full-time energies of both petitioners, resulting ultimately in a dynamic corporation whose sales increased by 54 percent during the years in question and whose taxable income, as reported, increased by almost 160 percent during the same period. By the end of 1964, the last year in question, net sales were almost $200,000 and taxable income, as reported, exceeded $24,000. In addition, the record indicates that petitioners worked long hours, performed not only managerial functions, but participated in their company's sales efforts, were the recipients of numerous awards for craftsmanship, and had lectured at the request of photographic associations, not only in their home State, but in neighboring States and Canada as well. While the evidence, in many instances, fails to disclose what part of the corporation's success was attributable to Walter alone, such an omission can in no way assist Walter since it is he, not respondent, who carries the burden of proving that the reasonable value of his services did not exceed the salary he received from the studio. While we recognize the difficulty of Walter's burden in a case such as this, we are also aware that he has, by his own choice, refrained from introducing any reliable evidence from which we might conclude that respondent's determination is incorrect. In an attempt to prove that Walter's salary was reasonable, petitioners rely strongly on three exhibits which contain statistical information for each year in question and which were compiled by the Professional Photographers of America, a professional photographic society. The exhibits purportedly indicate the percentage relationship between the "owner's salary" and "sales" of several hundred portrait and commercial studio owners and operators who responded to the society's profit and loss survey. After carefully considering the method by which the survey was conducted, we must conclude that the information contained in those exhibits is so unreliable as to require our rejection, without the need for considering whether the substantive results contained therein would otherwise support petitioner's reliance on them. Without discussing the numerous weaknesses inherent in the statistical data presented by those exhibits, we deem it adequate to cite from the exhibits themselves. Thus, the 1964 survey stated:

---

[4] *Mayson Mfg. Co.* v. *Commissioner,* 178 F.2d 115 (C.A. 6, 1949), reversing a Memorandum Opinion of this Court; *Patton* v. *Commissioner,* 168 F.2d 28 (C.A. 6, 1948), affirming a Memorandum Opinion of this Court; see also sec. 1.1375–3(a), Income Tax Regs.

There still persists the lack of response from studios of all sizes. The reported results gain statistical validity when averages are drawn from a larger number of returns. The data contained in this report were provided by 217 PP of A members representing slightly more than 5% of those eligible to participate. * * *

The 1963 survey contains a similar complaint regarding the lack of response from studios of all sizes and indicates that "less than 10% of those eligible to participate" did so. Inasmuch as approximately the same number of usable questionnaires were returned in 1962 as in 1963, we think it fair to conclude that the published results for the 1962 survey were no more reliable than the results for the following years in question.

Absent any reliable evidence from which we can determine the reasonableness of Walter's salary during the years in question, we must sustain respondent's determination on this issue.

The remaining issue concerns the $1,000 received by the studio in 1964 as a downpayment pursuant to a franchise agreement which it had entered into with Donald and Marilyn Wick. The studio reported that amount as long-term capital gain and each of its shareholders, including petitioners, reported their proportionate share of that amount in the same manner. In disallowing such treatment, the Commissioner determined that the money should have been included in petitioners' returns as ordinary income.

Respondent contends that the so-called franchise agreement was no more than a contract of employment and that the $1,000 was, in reality, a prepayment of ordinary income. Petitioners, on the other hand, contend that the 1964 transaction was in fact the sale of a franchise, the proceeds of which qualified for capital gains treatment.

While petitioners chose to characterize their contract with the Wicks as a franchise agreement, we must nevertheless examine the document in the light of the surrounding circumstances to determine whether, in fact, the sale of a franchise occurred. Under the "Studio Agreement" entered into between the studio and Record Plan, the studio did not receive the right to use or make any property or process which was protected by a patent, copyright, or trademark. To the contrary, paragraph 4 of the studio agreement suggests that if petitioners had decided to establish their own photographic album plan, there would have been no legal restrictions. For all that appears in the record, the studio were merely chosen to perform photographic work generated by Record Plan's sales of its albums. That agreement failed to specify any exclusive geographic territory and provided that either party could cancel the agreement with or without cause by giving 60 days' notice in writing.

Since the agreement between the studio and Record Plan failed to provide that the studio could sell its contract rights to third parties,[5] and since Record Plan retained the right to cancel its contract without cause on 60 days' notice, it is apparent that any prospective purchaser of the studio's photographic rights under the studio agreement would be assuming a tremendous risk to pay $7,000 for such tenuous rights. To overcome such a risk, petitioners required the Wicks to make a downpayment of only $1,000, with the $6,000 balance to be paid out of "the gross proceeds of the Family Record Plan business." In the event no business materialized from the plan, the Wicks were relieved of further financial liability to petitioners. However, obviously recognizing that the studio had been chosen by Record Plan because of the good reputation it enjoyed, and fearful that a complete divestiture of its responsibilities associated with the album plan might lead to Record Plan's cancellation of the contract, petitioners purported to sell their interest to the Wicks, but in a manner that would permit them to control virtually every aspect of the work required to be done under the contract with Record Plan. Thus, the Wicks were required to conduct their operations in the physical facilities of the Roob Studio; the Wicks were required to open a checking account at a specified bank, to deposit funds received under the family plan agreement, and to withdraw funds from that account only at the end of each 4-week period unless the studio agreed otherwise in writing; the studio was to assist the Wicks in making plans for the studio layout as well as in completing the studio area to be used by the Wicks; the studio was to provide practical training and counseling to the Wicks on photography, sales, and management of the Family Record Plan; the finishing of the photographs taken by the Wicks was to be completed by the studio; and the complete physical facilities for the conduct of the photographic service to be carried on by the Wicks was to be furnished by the studio, including camera equipment, all utilities, the finishing of photographs, film, and payments for necessary licenses. Considering the extensive control retained by the studio over the contract rights allegedly transferred to the Wicks, we do not think a sale ever occurred within the meaning of the capital gains provisions of the Code. As we stated in *Joe L. Schmitt, Jr.*, 30 T.C. 322 (1958), affd. 271 F. 2d 301 (C.A. 9, 1959), involving the purported sale of a territorial franchise:

---

[5] Par. 7 of the studio agreement provided, in part, that, "No assignment, either voluntary or by operation of law, shall relieve the parties of their contractual liability hereunder." It is therefore apparent that the studio remained liable for all work performed under the basic agreement with Record Plan.

We are of the opinion that the foregoing aspects of petitioner's relationship to the territorial franchise holder and the franchise itself are inconsistent with the position that he had disposed of all his substantial rights in the Exact-O-Matic System within each territorial area. It is important to note that we do not rest our conclusion upon any one of petitioner's retained interests or powers, and, without doubt, there are cases in which the reservation of some similiar powers and rights has been held not to be fatal. We hold that *all* of the rights, powers, and continuing interests reserved by petitioner, *taken in combination*, are of such character as to be inconsistent with a "sale or exchange" of property by petitioners, and that Congress did not intend to confer the special benefits relating to sales of capital assets in such situations. It is no answer to say that a number of the rights reserved by petitioner were merely to protect his interest in the system or to insure full payment for the assignments. That reason may explain why such reservations were made, but it does not detract from the conclusion that petitioner did not in fact dispose of all his substantial interest in the system by reason of such reserved rights when taken together with all other reserved rights, powers, and interests.

To the same effect, see *Theodore E. Moberg*, 35 T.C. 773, 784, 785 (1961). Considering the extent of control retained by petitioners in their purported sale of contract rights to the Wicks, we think it follows that the so-called franchise agreement was no more than an agreement to pay the Wicks for services rendered pursuant to a formula and an agreement by the Wicks to pay the $1,000 here involved as guaranteed income to Roob. Since there was no sale or exchange of petitioners' contract rights to the Wicks, we therefore must sustain the Commissioner's deficiency determination and hold that petitioners were not entitled to capital gains treatment on the $1,000 received from the Wicks, but rather, were required to report their proportionate share of that money as ordinary income.

*Decisions will be entered under Rule 50.*