ROY W. JOHNSON AND NINA JOHNSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ESTATE OF WALTER G. FRAZIER, DECEASED, FRANCES T. FRAZIER, EXECUTRIX, AND FRANCES T. FRAZIER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3789–68, 3790–68. Filed December 22, 1969.

*Charles F. Osborn*, for the petitioners.
*Lee A. Kamp*, for the respondent.

FAY, *Judge:* Respondent determined the following deficiencies in petitioners' income taxes for the taxable years 1958 through 1963:

| Year | Deficiencies Docket No. 3789–68 | Docket No. 3790–68 |
|---|---|---|
| 1958 | $1,548.78 | $5,476.67 |
| 1959 | 4,342.28 | 15,388.55 |
| 1960 | 4,865.22 | 18,158.36 |
| 1961 | 5,709.37 | 15,092.63 |
| 1962 | 6,493.76 | 18,455.44 |
| 1963 | 3,696.43 | 9,138.60 |

The sole issue for determination is whether certain payments received by Roy W. Johnson and Walter G. Frazier from Aetna Insurance Co. on the sale of their general insurance agency business are taxable as ordinary income or as capital gains.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Petitioners Roy W. Johnson (hereinafter sometimes referred to as Johnson) and Nina Johnson are husband and wife. They were residents of Seattle, Wash., at the time of the filing of their petition in this case. They filed their joint Federal income tax returns for the years 1958 through 1963, inclusive, on the calendar year basis with the district director of internal revenue at Tacoma, Wash.

Walter G. Frazier (hereinafter sometimes referred to as Frazier) and Frances T. Frazier were husband and wife during the taxable years in question. On November 26, 1965, Frazier died and Frances T. Frazier was named executrix of his estate. She was a resident of Honolulu, Hawaii, at the time the petition in this case was filed. For all years at issue Frazier and his wife filed their joint Federal income tax returns on the calendar year basis with the district director of internal revenue at Tacoma, Wash.

In 1937 Frazier established a general insurance agency business. Johnson joined Frazier as an employee in the same year. In 1940 Johnson became Frazier's copartner in the aforesaid insurance business, which became known thereafter as Frazier & Co. (hereinafter sometimes referred to as the company or the partnership). During the years in question the interests of Frazier and Johnson in the partnership were 70 percent and 30 percent, respectively.

Frazier & Co. acted as managing general agent in the State of Washington and northern Idaho for several insurance companies, usually representing seven or eight companies at a time. The partnership was not an employee of the insurance companies but rather acted as an independent contractor, entering into an agreement with each insurance company prior to its performance of services for such company. As of January 1, 1958, Frazier & Co. was managing general agent for the following insurance companies:

Eagle Fire Co.
American Marine & General Insurance Co.
North Pacific Underwriters
Northwestern Fire & Marine Insurance Co.
Standard Insurance Co.
Superior Insurance Co.
Utah Home Fire Insurance Co.
Century Indemnity Co.

Standard Insurance Co. and Century Indemnity Co. are subsidiaries of the Aetna Insurance Co. (hereinafter referred to as Aetna). Frazier & Co. handled various types of insurance, including fire, casualty, automobile, and marine.

The terms of the insurance policies ranged from 1 to 5 years and expired at the end of the specified term unless affirmatively renewed by the policyholder. The policies could be canceled at will by either party.

The contracts between the insurance companies and Frazier & Co. were in each case entitled "General Agency Contract" and set forth in detail the nature of the particular general agency. While some variation among the contracts existed, for the most part the provisions of these contracts were similar. The general agency contract appointed

Frazier & Co. "general agent" or "managing general agent" of a specified geographical area, and placed the general agent in charge of a designated line of insurance in that area. The managing general agent served primarily a management function for the insurance company. The insurance company delegated substantial authority and responsibility as to the issuance of policies and adjustment of losses to the general agent, who received compensation for its work in various forms. It was the responsibility of the general agent, under these agreements, to develop business through association with local agents, appoint local agents, issue policies in the name of the insurance company, adjust and pay losses, account for and remit periodically all premium income, and generally to advance the best interests of the contracting insurance company.

In all cases the contracts required the general agent to submit reports to the insurance company pertaining to the endorsements made, business transacted, agents appointed, losses sustained, and other details relating to the business of the insurance company. The managing agent was required to turn over to the insurance company data with respect to the appointment or removal of local agents. The agreements further provided that the insurance company be permitted to personally examine and audit all the papers, records, and accounts relating to that company.

The general agency agreements were unlimited in duration but terminable at will by either party upon 90 days' notice. Many of the contracts, in addition, expressly provided that in the event of termination of the contract neither party would have any claim against the other for loss of prospective profits or commissions.

In most cases, the general agency agreement did not specify the rights of the insurance company with respect to the "agency plant" (i.e., the right to contact the agents and solicit their business). However, three contracts did contain some reference to the posttermination rights of the insurance company to the agency plant. The agreement between Frazier & Co. and Superior Insurance Co. stated the following with respect to the use of the agency plant after termination:

It is understood and agreed that any agencies are to be appointed and cultivated at the expense of the General Agent, and if this General Agency Agreement be terminated, the Company agrees, for a period of 12 months after termination, not to solicit or in any manner interfere with said agencies or directly or indirectly solicit the business placed on the books of the Company by the General Agent, nor to divulge to any party the expiration date or other information pertaining to said business, without the written consent of the General Agent; provided, however, that if this contract is terminated by the Company for nonpayment of balances, as provided in Article Thirteen, then this Article shall be inoperative.

The Eagle Fire Co. contract contained a reference to posttermination rights only upon the insolvency of the general agent. This contract reads in part:

EIGHTH:

\*       \*       \*       \*       \*       \*       \*

That this Agreement shall be immediately terminated in the event the General Agency becomes insolvent or makes an assignment for the benefit of creditors, and, in such an event, the right of the Company to the use and profit of the agency plant shall be conceded and held inviolate, \* \* \*

A similar clause is contained in the North Pacific Underwriters agreement.

Under a system governing the insurance agency business called the American Agency System, the local agent acts as an independent contractor and is free to place policies with any insurance company he represents. Although the local agents had the option of dealing directly with a particular insurance company, they often chose to do business with the general agent because the general agent was situated in the geographical area of the local agent and was familiar with local insurance needs. Also, the general agent represented several companies at once and was therefore in a better position to satisfy the individual needs of a particular agent or policyholder. The local agent was furnished periodically with records of policies he had issued and was notified of expirations of policies so that he could contact the insured and secure the renewal of expiring policies.

While the local writing agents were licensed in the name of the contracting insurance company, the general agent was responsible to the contracting insurance company for all policies placed through the general agent. By January 1, 1958, Frazier & Co. had approximately 300 local agents representing insurance companies in Washington and northern Idaho.

The general agent was compensated under the general agency contract by overriding commissions and/or flat commissions. A majority of the general agency agreements provided for an overriding commission to the general agent, usually between 5 and 15 percent of net premiums from business placed with the contracting insurance company through the general agent. The overriding commission represents a commission earned by Frazier & Co. as general agent in excess of the local agent's commission. In such cases the local agents remitted the premiums less their commissions to Frazier & Co. which, in turn, subtracted the applicable overriding commission before remitting the balance of the premiums to the insurance company. In the case of flat commissions, the general agent received a flat commission which he shared with the local agent.

Many general agency contracts also provided for a contingent commission to the general agent, ranging from 10 to 50 percent of the net profits on certain lines of insurance business generated within the general agent's territory.

In addition to the commissions, most contracts provided for reimbursement of the general agent for certain direct expenses incurred in connection with the insurance company's business.

Frazier & Co.'s profit and loss statements from 1950 through 1957 disclosed the following amounts of commissions, expenses, and profits:

| Year | Commissions | Expenses | Profit (or loss) |
|------|-------------|----------|------------------|
| 1950 | $99,112.02 | $90,062.19 | $9,049.83 |
| 1951 | 103,539.05 | 94,011.95 | 9,527.10 |
| 1952 | 108,643.60 | 98,978.66 | 9,664.94 |
| 1953 | 109,256.39 | 100,834.04 | 8,422.35 |
| 1954 | 105,264.12 | 100,583.27 | 4,680.85 |
| 1955 | 104,445.16 | 104,476.01 | (30.85) |
| 1956 | 90,220.58 | 105,634.36 | (15,413.78) |
| 1957 | 98,343.87 | 101,717.46 | (3,373.59) |

On March 1, 1958, Frazier & Co. entered into an agreement for the sale of its general agency business and certain of its physical assets to Aetna, effective January 1, 1958. The physical assets of Frazier & Co. consisting of automobiles, furniture, and fixtures were sold for $23,619.63.

Article III which provided for the sale of the insurance business reads:

ARTICLE III. SALE OF INSURANCE BUSINESS:

1. The Company agrees to and does hereby sell, assign, transfer and deliver to Aetna all records, data, memoranda and information of expirations, memorandum and information of its agency plant, good will, books of account, and all other information pertaining to the Company's insurance business as general agent for Standard Insurance Co. of New York, Century Indemnity Co. and Piedmont Department of Standard Insurance Company together with any and all other records, data, memoranda and information of expirations pertaining to all other companies in which insurance business has been placed by the Company in the conduct of its general agency business and which can be effectively transferred to Aetna by the Company. * * *

The purchase price of the assets described in Article III was based upon a percentage of the gross premiums to be received over a 5-year period from the agents comprising the "agency plant" of the partnership as of January 1, 1958. The agreement provided a purchase price in the amount of:

Ten percent (10%) of the net gross premiums produced and placed with Aetna and any of its subsidiaries in each of said five (5) years from the agents comprising the agency plant of the Company as of the effective date of this agreement. * * *

Aetna also agreed to pay all the operational expenses of the Washington and north Idaho service offices, including field expenses for the territory serviced by those offices.

The agreement contained a convenant not to compete. This provision read:

ARTICLE V. RESTRICTION ON COMPETITION:

It is agreed that for a period of fifteen (15) years from January 1, 1958, neither the Company, Frazier or Johnson will engage as a supervising general agency in the fire, auto, casualty or marine insurance business, other than on a surplus line basis, in the State of Washington and that part of the State of Idaho lying north of the Salmon River * * * and that the partners will not become employees, partners, officers or stockholders of such a supervising general agency for such period of time and in said state and area.

The agreement placed no value on the convenant not to compete.

The agreement also contained an employment contract between Aetna and the partners of Frazier & Co. in which Aetna agreed to employ the partners at an annual salary of $5,000 each for a period of 5 years. Under this provision Frazier would be designated manager of the Washington-Idaho service office of the Aetna Insurance Group and Johnson would be the superintendent of the special risk department. However, the agreement further provided that the employment could be terminated at will by either the insurance company or the employees.

In addition to the annual salary of $5,000, Aetna agreed to pay Frazier and Johnson a contingent commission equal to 5 percent of the increase in the amount of gross written premiums produced by the agency plant of Aetna as it existed immediately prior to January 1, 1958, over the amount of gross written premiums produced by such agency plant in 1957. This commission was subject to certain contingencies. Aetna also agreed to pay a contingent commission of 5 percent of net gross premiums produced by all new agencies appointed during the 5-year period, while Frazier and Johnson remained in its employ, subject to specified contingencies.

On October 14, 1957, Frazier & Co. sent a letter to its agents notifying them of the sale of its general agency business to the Aetna Insurance Co. This letter reads in part:

We have arranged the sale of our General Agency business to the Aetna Insurance Group effective January 1, 1958. As outlined in the enclosed copy of a letter advising Aetna agents of the purchase, the staff of our company is being joined with that of the Aetna and the entire personnel of both will be retained.

The combined operation will be known as the "Aetna Service Offices" with locations at Seattle, Spokane and Yakima. We will be in a position to provide our agents with increased service and improved facilities for all lines of insurance. This move is in line with the trend in business generally as it will insure a continuing Agency-Company relationship with a large well established company writing multiple lines.

All transactions effective on and after January 1, 1958 in connection with business written in our present companies will be processed through the Aetna Service Offices. The procedure will be exactly the same as heretofore through our office. New and renewal business effective January 1, 1958 and subsequent will be written only in the Aetna Insurance Company and no further business will be placed with our present companies.

Pursuant to Article III of the March 1, 1958, agreement, Aetna made payments to Frazier & Co. during the 6-year period starting in 1958 totaling $410,488.65. The amounts received by Frazier & Co. in each year and the allocation of such amounts between Frazier and Johnson were as follows:

| Year | Frazier & Co. | Frazier | Johnson |
|---|---|---|---|
| 1958 | $31,463.66 | $22,024.56 | $9,439.10 |
| 1959 | 73,073.78 | 51,151.65 | 21,922.13 |
| 1960 | 81,212.80 | 56,848.96 | 24,363.84 |
| 1961 | 82,895.19 | 58,026.63 | 24,868.56 |
| 1962 | 89,547.90 | 62,683.53 | 26,864.37 |
| 1963 | 52,295.32 | 36,606.73 | 15,688.59 |

These payments were reported as long-term capital gain on petitioners' Federal income tax returns for the years in issue.

After March 1, 1958, Frazier & Co. continued to collect commissions on business written and in force and for which premiums remained outstanding at the time of the agreement. These commissions, termed "run-off" business, were not included in the sale and were received by the partnership outside the contract. The partners reported these receipts as ordinary income during the years in question. Aetna permitted Frazier and Johnson, while in its employ, to continue to attend to such business during regular business hours.

Subsequent to March 1, 1958, Frazier & Co. remained an active partnership and in addition to the runoff business conducted an insurance finance business called Premium Acceptance Co. until 1961. The partnership income for the years 1958 through 1962, exclusive of the payments received from Aetna upon the sale of the insurance business set forth above, but including contingent commissions of $955 received in 1959 from Aetna, amounted to:

| Year | Frazier & Co. | Frazier | Johnson |
|---|---|---|---|
| 1958 | $10,535 | $6,535 | $4,000 |
| 1959 | 8,495 | 5,107 | 3,388 |
| 1960 | 1,389 | 921 | 468 |
| 1961 | 870 | 105 | 765 |
| 1962 | (1,423) | (996) | (427) |

As of January 1, 1958, Frazier and Johnson became employees of Aetna, receiving compensation of $5,000 each per year. Frazier was

designated as manager of the Washington-Idaho service office of the Aetna Insurance Group and remained in this position for 3 years and 2 months. Johnson was designated superintendent of the special risk department. Johnson remained an employee of Aetna until 1968, serving in various supervisory capacities.

Aetna Insurance Co. was organized by special charter of the State of Connecticut in 1819. Aetna conducts a fire and casualty insurance business, and is licensed, either by itself or through its subsidiaries, to transact business in each of the 50 States of the United States of America, the District of Columbia, Canada, Puerto Rico, the Virgin Islands, and foreign countries and territories through the American Foreign Insurance Association.

During the years prior to 1958, Aetna and the following wholly owned subsidiaries comprised the Aetna Insurance Co. Group (hereinafter referred to as Aetna Group) which had contracts with Frazier & Co.: Standard Insurance Co. of New York, Piedmont Division of Standard Insurance Co., and the Century Indemnity Company (of Connecticut).

During the taxable years in question, Aetna carried on its own fire-and-casualty insurance business primarily through direct relationships with and solicitation by local writing agents and local insurance agencies who, as independent contractors, usually represented several competing insurance companies. Standard Insurance Co., a subsidiary of Aetna, carried on business in the territory served by Frazier & Co. through the managing general agency system. Century Indemnity Co., a subsidiary of Aetna, carried on business in the territory served by Frazier & Co. through both the managing general agency system and on a direct basis through local agents.

In the 3-year period preceding January 1, 1958, approximately 30 percent of the commission income received by Frazier & Co. was from business placed by the partnership with the Aetna Group.

Respondent has determined deficiencies for the taxable years 1958 to 1963, inclusive, on the ground that Aetna's payments during those years in excess of $23,619.63, received in 1958 for the physical assets, are taxable as ordinary income and not as capital gain.

OPINION

The sole issue for determination is whether amounts received by Frazier and Johnson during the taxable years 1958 through 1963 upon the sale of their insurance business to Aetna are taxable as capital gains or ordinary income.

Respondent takes the position that the proceeds of the sale constituted an assignment of anticipated income rather than a sale of capital assets and therefore should be taxed as ordinary income. Alternatively,

respondent claims that the payments constituted, in effect, consideration either for personal services rendered by Johnson and Frazier as employees of Aetna following the sale or for the covenant not to compete contained in the agreement. Petitioners, on the other hand, relying heavily on the form of the transaction and the terms of the agreement, claim that the transaction constituted a sale of the tangible and intangible assets of an insurance business and that the proceeds are therefore taxable as capital gains. As to the employment arrangement between Aetna and Johnson and Frazier, petitioners contend that various forms of compensation were provided for in the contract in exchange for such services and that these amounts were, in fact, reported by the petitioners as ordinary income. To attribute a portion of the sales price to services rendered by the partners as employees of Aetna, petitioners assert, is to rewrite the contract.

The respondent advances two theories to support his characterization of the transaction in question as an anticipatory assignment of income. In the first place, respondent claims that Frazier & Co. could not have sold "property" to Aetna since the partnership did not own the "records, data, memoranda and information of expirations, * * * of its agency plant, good will [etc.]" which was purportedly sold to Aetna.[1] Secondly, respondent argues that even if Frazier & Co. did own the expiration information, the proceeds of such sale were, in substance, a substitute for future ordinary income and therefore under the doctrine of *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958),[2] such proceeds must be taxed to petitioners as ordinary income. We think that respondent's position must be rejected under the circumstances of the instant case.

It has been recognized by this and other courts that insurance expirations constitute an intangible asset in the nature of goodwill and that the sale of such assets gives rise to capital gain. *George J. Aitken*, 35 T.C. 227 (1960) ; *Edward A. Kenney*, 37 T.C. 1161 (1962) ; *Alfred H. Thoms*, 50 T.C. 247 (1968) ; and *Commissioner* v. *Killian*, 314 F. 2d 852 (C.A. 5, 1963), affirming a Memorandum Opinion of this Court. Indeed the respondent has conceded on brief that a sale by a local agent of his insurance agency business is to be treated as the sale of "property" for purposes of section 1221.[3] However, respondent attempts to draw a distinction between the local insurance agency and Frazier & Co., a general agency. Respondent contends that in the instant case

---

[1] Sec. 1221, I.R.C. 1954, provides:
SEC. 1221.  CAPITAL ASSET DEFINED.
For purposes of this subtitle, the term "capital asset" means *property* held by the taxpayer (whether or not connected with his trade or business) * * * [Emphasis added.]

[2] Respondent also cites *Commissioner* v. *Gillette Motor Co.*, 364 U.S. 130 (1960) ; *Corn Products Co.* v. *Commissioner*, 350 U.S. 46 (1955) ; *Hort* v. *Commissioner*, 313 U.S. 28 (1941) ; and *Kieselbach* v. *Commissioner*, 317 U.S. 399 (1943).

[3] See fn. 1, *supra*. All statutory references are to the Internal Revenue Code of 1954.

Frazier & Co. did not own the expirations because the local agents who placed their business through Frazier & Co. owned the exclusive right to the expirations on such business. In fact, respondent continues, were the general agent to make use of the expiration information, the local agent would plainly have a cause of action against such general agent under State law for interference with the local agent's property. Since the partnership did not own the expirations, respondent concludes that the sale proceeds represented future income rather than the value of property sold. Although *Edward A. Kenney, supra,* and *Alfred H. Thoms, supra,* involved general agencies, respondent asserts that they were not true general agencies and in fact acted primarily as local agencies.

We agree with respondent that as between the local agent and general agent, the local agent owns the right to contact and solicit renewals from policyholders. Respondent fails to recognize, however, that Frazier & Co. possessed an entirely different and distinct property interest in the records, data, memoranda, and information of expirations of its insurance agency from that possessed by the local agents. These records were not used by Frazier & Co. to contact policyholders and solicit renewals but rather to maintain a much more valuable association with the local agents. At the time of the sale in question, Frazier & Co.'s "agency plant," a well-defined term in the insurance industry, consisted of over 300 local agents who were affiliated with that company. Each local agent placed a number of insurance policies through Frazier & Co., for which the company became entitled to overriding and contingent commissions. Frazier & Co. was able to encourage its agency plant to continue to do business with them only by providing various services to the local agents. In the course of serving its agency plant, Frazier & Co. compiled a great deal of records, memoranda, and information which were essential to the success of its general agency business. In addition, the long-standing and favorable relationship between Frazier & Co. and its agents and the reputation it enjoyed were responsible for the continued association of the local agents. It is clear that Frazier & Co's information and expirations were highly valuable assets, in the nature of goodwill, even though it had no right to use the expirations to contact policyholders individually.

Moreover, these records were of great value to Aetna following the sale, in spite of the local agents' right to the expirations on the customer level. Aetna's vice president at the time of the sale in question, Clyde M. Marshall, testified that Aetna was interested in Frazier & Co.'s "season book of business" in the Aetna Co. or its subsidiaries and that the purchase "exposed [the insurance company] to getting the business of all the companies represented by [Frazier & Co.]." The insurance company did not intend to contact the policyholders

individually. The purpose of its acquisition of the general agency's book of business, i.e., its agency plant, was to increase its own premium receipts by making use of that agency plant. Aetna hoped to obtain renewals from customers already doing business with Aetna and to secure patronage of policyholders holding policies of the other insurance companies represented by Frazier & Co. At least 70 percent of Frazier & Co.'s business was outside of the Aetna Insurance Group. Even as to the 30 percent of the partnership's business which was previously held by the Aetna Group, Aetna required the records and goodwill of Frazier & Co. in order to secure the renewals of those policies.

Respondent argues that Aetna already possessed much of the information which the company purportedly acquired from Aetna as a result of the periodic reports made by the company to Aetna under the general agency contract provisions. Respondent stresses that Aetna was furnished reports notifying Aetna of local agents appointed, policyholders, and other information. Therefore, it is urged, the Aetna Group could have merely terminated its general agency contracts with Frazier & Co., which contracts were cancelable at will without penalty by either party, and use the information they had in their records to carry on Frazier & Co.'s insurance agency business after termination. Petitioners have devoted a substantial portion of their brief to a discussion of the rights of an insurance company to the agency plant of a general agent under State law. They have directed our attention to *V. L. Phillips & Co.*, v. *Pennsylvania Threshermen*, etc., 199 F. 2d 244 (C.A. 4, 1952), which held an insurance company answerable in damages for use of a general agent's agency plant after termination of a general agency contract. Respondent points out that the decision in *V. L. Phillips* rests upon the interpretation of the particular contractual provision involved in that case and suggests that its holding is therefore inapposite to the instant case.

It is not necessary for our decision in this case to establish whether or not Aetna could, without incurring liability to Frazier & Co., have made use of the company's agency plant. It is clear that Aetna would not have done so with compensating Frazier & Co. This is evident from Aetna's decision to purchase the general agency rather than cancel the management contracts as respondent has suggested. Whether Aetna's course of action is attributable to moral compulsion or an attempt to avoid suit by petitioners is beside the point. The fact is that Frazier & Co. owned a valuable property interest in its records, memoranda, and goodwill for purposes of section 1221 which stems from the ready marketability of its business.

Although unnecessary for our decision, we do take cognizance of the fact that several of the contracts in the instant case did contain provi-

sions restricting the posttermination rights of the insurance companies in the agency plant and it appears likely that Aetna would have incurred liability to Frazier & Co. had it used the agency plant without a prior purchase. Moreover, as respondent has stated in his brief, Aetna's records did not contain information pertaining to 70 percent of the business of Frazier & Co., since that portion of the partnership's business was done with insurance companies outside the Aetna Group. Therefore, as Clyde M. Maxwell testified, Aetna would have failed to acquire a major portion of Frazier & Co.'s book of business had the purchase in question not been made.

Respondent contends further that the proceeds of the sale were received in substitution for, or in anticipation of, future ordinary income. *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962); *Joseph W. Brown*, 40 T.C. 861 (1963). Respondent calls our attention to the fact that the purchase price was described in the agreement in the form of a percentage of net premiums generated by the Frazier & Co. agency plant following the sale, not unlike the commission arrangement which existed prior to the sale. There is no merit to this point.

We have already concluded that the payments in question were received upon sale of valuable assets, in the nature of goodwill, to Aetna. It follows that such payments do not constitute a substitute for future income. The mere fact that the purchase price was measured in term of future receipts does not imply that the purchaser has acquired the right to future commissions. In the case at bar, in particular, where the purchaser of Frazier & Co.'s records and goodwill was an insurance company rather than another insurance agent, it is clear that the subject matter of the sale was not anticipated commissions. Aetna was concerned primarily with increasing its insurance policy sales. Plainly it did not regard the agency plant as a source of commission income.

Respondent's final argument is that a portion of the sale proceeds is attributable either to the covenant not to compete or to the employment of Frazier and Johnson after the sale.

We have concluded on the basis of the record before us that no portion of the purchase price was allocable to the covenant not to compete. We have considered, particularly, the fact that no allocation was made to the covenant not to compete in the agreement and that the covenant was not separately bargained for. *Delsea Drive-In Theatres, Inc.* v. *Commissioner*, 379 F. 2d 316 (C.A. 3, 1967), affirming per curiam a Memorandum Opinion of this Court; *Rinehart Oil News Co.* v. *Commissioner*, 369 F. 2d 692 (C.A. 5, 1966), affirming per curiam a Memorandum Opinion of this Court; and *Edward A. Kenney, supra.*

Moreover, the covenant not to compete was closely related to the sale of goodwill and therefore failed to have any independent sig-

nificance apart from merely assuring the effective transfer of that goodwill. *Ullman* v. *Commissioner*, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957); *Aaron Michaels*, 12 T.C. 17 (1949); *Rodney B. Horton*, 13 T.C. 143 (1949); and *Alfred H. Thoms, supra.*

We agree with respondent, however, that to the extent that Frazier and Johnson were undercompensated during the period of their employment by Aetna, a portion of the sale price represented compensation to petitioners for services performed as employees. The fact that the contract expressly provided a salary of $5,000 each to Frazier and Johnson does not preclude our deciding the true value of the services rendered and realistically treating such amounts as ordinary income to the petitioners. *Walter J. Roob*, 50 T.C. 891 (1968). The respondent has satisfied us that a salary of $5,000, provided in the agreement, was below that which men of Frazier's and Johnson's experience and talents should have earned at the executive positions they held with Aetna. We think that $10,000 per annum, each, is a reasonable estimate of the value of the services rendered by Frazier and Johnson during the periods of their employment. Therefore, $5,000 per year for the 5-year period of Johnson's employment with Aetna, and $5,000 per year during Frazier's period of employment prior to his retirement, must be treated as ordinary income, representing the portion of the proceeds attributable to services rendered by Johnson and Frazier to Aetna.

Except as modified by the preceding paragraph, we hold that Frazier & Co. sold valuable assets to Aetna in the nature of goodwill and petitioners are entitled to treat the proceeds of such sale as capital gains.

*Decisions will be entered under Rule 50*